UNITED STATES of America,
Plaintiff-Appellee,

v.

Larry Anthony ROGERS, M.D.,
Defendant-Appellant.

No. 79–5259
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1980.

* Fed.R.App.P. 34(a); 5th Cir. R. 18.

Louis M. Moore, Bertrand C. Moser, Houston, Tex., for defendant-appellant.

Anna E. Stool, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before COLEMAN, Chief Judge, HILL and GARZA, Circuit Judges.

PER CURIAM:

Larry Anthony Rogers, M.D., appeals from his conviction on all counts of an eleven count indictment charging him with unlawfully dispensing and causing to be dispensed Schedule II and IV controlled substances in violation of Title 21, United States Code, § 841(a)(1); Title 21, Code of Federal Regulations, § 1306.04(a); and Title 18, United States Code, § 2(b).

Each count charged that he had dispensed or caused to be dispensed these controlled substances not in the usual course of professional practice and not for a legitimate medical purpose. Counts 1, 2, 4, 6, 7, 9, 10 and 11 dealt with Schedule II controlled substances and counts 3, 5 and 8 dealt with a Schedule IV substance, Valium. After the guilty verdict by the jury, Dr. Rogers was sentenced for a period of four years in the penitentiary with a special parole term of two years as to each of counts 1, 2, 4, 6 and 7, to run concurrently with each other. He was further sentenced to three years imprisonment with a special parole term of two years as to each of counts 3, 5 and 8 to run concurrently with each other, but consecutive to the sentences imposed as to counts 1, 2, 4, 6 and 7, making a total of seven years that he had to serve with a special term of parole of four years. On counts 9, 10 and 11, he was sentenced to five years with a special term of parole of two years, the execution of which was suspended and the defendant placed on probation with supervision for a period of five years. These sentences were to run concur-

rently with each other, but consecutive to the sentences imposed as to counts 1, 2, 3, 4, 5, 6, 7 and 8.

Appellant Rogers attacks his conviction on counts 3, 5 and 8, the counts dealing with his prescribing Valium, a Class IV controlled substance, on the ground that the evidence was insufficient in that the Government failed to put on any expert testimony as to what physical examination, if any, a doctor must perform before he can legitimately prescribe Valium. Appellant also complains about the admission into evidence of prescriptions written by him for non-testifying patients.

The thrust of the Government evidence was to show that Dr. Rogers was indiscriminately writing prescriptions for controlled substances to patients that he never even examined and that he was, in the words of the medical profession, a "paper hanger" or a "scrip writer", as characterized by Dr. Barr, the expert witness for the Government. The evidence is clear that he asked his patients what they wanted prescribed, instead of his prescribing what he thought they needed after examining them. The eleven counts of the indictment are based on Dr. Rogers' prescribing controlled substances to two undercover law officers, Don Sparks and Jane Herber, who posed as patients on four occasions between May 6 and June 27, 1977. The investigation of Dr. Rogers began when one Miss Lonnie Patrick, working in an undercover capacity with the Bellaire, Texas, Police Department, had an appointment to see the appellant. Officer Don Sparks and Officer Cohen, agents with the Texas Department of Public Safety, Narcotics Division, accompanied her to the appellant's office, but remained outside while she kept her appointment. Ms. Patrick filled out a medical history form, had her blood pressure taken, and was weighed by the receptionist. When she went in to see the defendant Rogers he had the form that she had filled out with him. He asked her what her problem was and she informed him that she was having trouble sleeping and that in the mornings she was unable to stay awake.

Instead of the appellant Rogers prescribing for Ms. Patrick, he asked her what she wanted and she told him Quaalude and Desoxyn. After she informed Dr. Rogers what she wanted he proceeded to write her three prescriptions; one for Quaalude, one for Desoxyn, and one for Valium or Librium that she had not even asked for. Then the appellant Rogers asked Ms. Patrick if she wanted anything else and she asked him if he had any suggestions. He then told her just to try those for a while. Ms. Patrick paid $25.00 in cash for her visit to the doctor's office and left.

On May 6th Ms. Patrick returned to the office, this time accompanied by Agent Sparks. When they arrived at the appellant's office a large number of young people covering nearly every inch of the reception area were waiting to see the appellant. When she was able to go in to see the doctor she told him she was having the same problem as the last time. He again wrote her prescriptions for a Desoxyn and Quaalude. Ms. Patrick testified that Dr. Rogers did not examine her on either of these two visits. While her blood pressure and weight were taken on the first visit, nothing like that was done on the visit of May 6th. After appellant had written her prescriptions he asked for his $25.00 fee. Ms. Patrick told him that she had a friend of hers, Don Sparks, who had the money and also wanted to see him. Agent Sparks was allowed into the doctor's office, talked to the appellant briefly, then appellant Rogers asked him what he wanted and started writing prescriptions. No history of Sparks was taken. He was not weighed nor was his blood pressure taken by the receptionist, and he received no physical examination of any kind. Agent Sparks testified that after introducing himself to the appellant, the appellant asked him what he wanted, that he replied that he wanted some Desoxyn and then the appellant asked him, "What else?" and that he replied that he also wanted some Quaalude. Appellant asked him if he wanted anything else, and before Sparks could reply, the appellant said, "How about Valium or Librium?" and that he told him, "I want some Valium." At the conclusion of his brief visit on May 6th, Agent Sparks paid $50.00 in cash for himself and Ms. Patrick, since checks were not accepted and all visits to the appellant had to be paid in cash. During cross-examination of Ms. Patrick it was brought out that Agent Sparks, on the first visit, told the appellant Rogers that he was a truck driver and had turn-around routes which caused him insomnia at night and difficulty staying awake during the day.

On June 2, 1977, Agent Sparks, accompanied by Ms. Patrick, made another visit to the appellant's office. This time the receptionist gave him a medical history form to fill out. Sparks wrote on it that his problem was "drowsiness and staying awake." Dr. Rogers had the form when he saw Sparks on this occasion. Again the appellant Rogers asked Sparks what he wanted. Agent Sparks testified that he wanted some Preludin. The appellant told him that Preludin was hard to get and suggested Desoxyn or Biphetamine. Sparks agreed to any one of them. Appellant Rogers then asked "What else?" and Agent Sparks stated he wanted to try some Tuinal. Again, appellant Rogers asked "What else?" and Sparks stated that that should do for the time being. But appellant Rogers then asked him "How about some Librium or Valium for relaxation?" Sparks again opted for Valium. He paid the required fee and then left with his prescriptions for Tuinal, Valium and Biphetamine capsules.

The next visit of Agent Sparks to the appellant's office was on June 24th. Agent Sparks testified that on this occasion some of the people in the outer office were having trouble standing up and appeared to him to be under the influence of something. While Agent Sparks was waiting to see appellant Rogers a nurse or receptionist pre-wrote some prescriptions for him and when Agent Sparks entered the appellant's office, all Rogers did was sign his name to the pre-written prescriptions for Tuinal, Biphetamine and Valium. He paid $35.00 in cash for these prescriptions and then left.

The state narcotic agents then enlisted the services of a Drug Enforcement Admin-

istration agent, Jane Ann Herber, who, working in an undercover capacity using the name of Dixie Morrow, was able to see appellant Rogers on June 27th, 1977. Taking the appointment of an informant who had previously contacted the doctor's office, Agent Herber testified that when she arrived at the doctor's office at about 10:55 in the morning, she walked up to the receptionist's desk and told the receptionist, one Sandy, that she had an appointment at 11:15. She was told that they could not find an appointment for her but after explaining that the appointment was made by this other individual she was finally told to wait. She testified the office was crowded with people between the ages of eighteen and thirty years old and that people would come in and out. Some people were sitting and some were standing and some people were sitting on the floor. She waited and sometime around 1:00 P.M. she was given a form to fill out. She finally got in to see the doctor after the receptionist had taken her weight and blood pressure. Upon entering the doctor's office the doctor asked her what was bothering her and she told him that she wanted something to stay awake and he said "Well, what has worked in the past?" She told him Biphetamines. She explained to him that she worked mostly at night and had to sleep in the daytime since she worked either as a hostess or as a bartender and that she had to sleep in the daytime but sometimes had trouble with that. The appellant Rogers then asked her "Well, what helps you for that?" She responded, "Quade." The conversation between appellant Rogers and herself then was about a sore that she had on the side of her mouth and he told her he was going to give her some medicine for that after inquiring if she had similar sores in other parts of her body. He asked her if she was taking birth control pills and when she told him that she was, he asked her what kind and she said Demulin. He told her he was going to give her some Pramacon, which he said worked better with birth control pills. She testified that appellant Rogers never gave her any physical examination. He gave her a prescription for Quaaludes and one for Biphetamine and for Pramacon. She paid the receptionist $25.00 and then left.

De Wayne Williamson, owner of Weslayan Pharmacy where many of the appellant's prescriptions had been filled, identified several Government exhibits. Some of these exhibits were for people that later testified at the trial as to the circumstances under which they received the prescriptions which had been identified by Williamson. Many of these individuals who testified filled their prescriptions for controlled substances at least once or twice a week. The Government, through Williamson, identified Government Exhibit 22 as a large number of prescriptions which the appellant had written for several hundred other patients over a period extending from January to July 1977. Almost all of these prescriptions were for Schedule II or Schedule IV controlled substances. These exhibits were admitted over the objections of defense counsel.

Likewise, Timothy Hayes, the owner of Twin Oaks Pharmacy, another pharmacy at which a large number of prescriptions written by the appellant had been filled, identified Government's Exhibit 23 as a large number of prescriptions filled by him for Schedule II and Schedule IV controlled substances that appellant had written from March to August of 1977. Some of these prescriptions were for people that actually testified and many others were prescriptions for people that did not testify. This exhibit was likewise admitted over the objection of defense counsel. The witness Hayes also testified that sometimes during the first part of April 1977, appellant Rogers had on three or four occasions used a room in the Twin Oaks Pharmacy for the purpose of writing prescriptions for his patients. He testified that on these occasions, each of which lasted about two and one half hours, the appellant saw about fifty patients, most of whom were in their twenties and early thirties. The only medical equipment that the appellant had with him during these occasions, as far as the witness Hayes could observe, was a stethoscope.

As stated before, the Government's expert witness was Dr. Robert Barr, an associate professor of obstetrics and gynecology and family practice at the University of Texas Medical School and a part-time professor of pharmacology at the University of Houston College of Pharmacy. He identified Desoxyn as an amphetamine appetite suppressant to be used in the treatment of obesity, Quaalude as a hypnotic, sedative drug, Valium as a tranquilizer or muscle relaxant, Tuinal as a sedative, hypnotic drug, and Biphetamine as an amphetamine appetite suppressant. According to his testimony, Dr. Barr said that all of these drugs are very often abused, although Valium is probably abused less than the other drugs. If these drugs are abused, he said, all of them cause physical dependency and individuals who acquire such addictions are susceptible to overdose. He stated that he, himself, never prescribes these drugs because their dependency properties are so great. He does prescribe Valium to certain patients in small amounts over a period of time, and he always explains to his patients that they must be seen before they can refill their prescriptions and that they're not to exceed the number of pills per day that he prescribed. He testified that he never prescribes any Schedule II controlled substance before doing a general physical examination of the patient to make sure that there was no organic cause of the patient's depression. This physical examination would consist of taking the patient's blood pressure, pulse, listening to the heart and lungs, examining the abdomen and checking the thyroid. He further stated that while the nurse might take the blood pressure, pulse count and weight of the patient, the rest of the examination is done by himself and that he would also go into great detail about the patient's past medical history in addition to what the patient or the nurse had written on the medical history chart.

Dr. Barr also testified that if a patient came to him and told him that he or she suffered from insomnia during the night and was unable to stay awake during the day, he would not prescribe a combination of Quaalude, a hypnotic sedative, and Desoxyn, an amphetamine, to the same patient at the same time and that to do so would not be in keeping with the sound practice of medicine. He also said in his testimony that he would not prescribe Biphetamine, an amphetamine, and Tuinal, which is a different brand name of Quaalude to the same patient at the same time nor would he prescribe Desoxyn, Quaalude and Valium at the same time for the same patient. He testified that in his opinion a doctor who prescribes these drugs and these combinations with any frequency would not be acting in the usual course of the medical profession or for a legitimate medical purpose.

Appellant Rogers testified in his behalf. He said he had his patients usually file a medical history form. Dr. Rogers would then give a mental status examination and that a physical examination is not necessary to diagnose and to prescribe for anxiety, stress and depression and that the medications in this case were properly prescribed with only a mental status examination and without a physical examination.

Dr. Barr, the Government's expert witness, testified that in his opinion merely talking to a patient would not be a sufficient basis no matter how long the conversation for the prescribing of Schedule II controlled substances and that a doctor who conducts his practice in such a manner is not conducting himself in the usual course of the medical profession and that a mental status examination would take at a minimum between twenty and thirty minutes. The prescription of medications would be based on the results derived from a combination of the mental status examination and the physical examination of the patient. Dr. Barr further reviewed in his testimony the prescriptions in the Government's exhibits, which were for a great number of prescriptions which included prescriptions for patients that did not testify during the trial. He testified that it was not the standard operating procedure for physicians in the Houston area to prescribe Desoxyn, Preludin, Biphetamine, Quaalude and Valium in the manner which he had observed

through these prescriptions and with such frequency as was evidenced by them. He further said that he could see no medical justification for the writing of prescriptions for these kinds of medications and the number and with such frequency for individual patients.

In order to convict appellant Rogers, the Government had to prove that he distributed or dispensed controlled substances and that he acted knowingly and intentionally and that he did so other than for a legitimate medical purpose and the usual course of his professional practice.

■ Appellant Rogers argues that his Motion for Acquittal, with regards to counts 3, 5 and 8, which concern his prescribing Valium to Agent Sparks, should have been granted because Dr. Barr, the Government's expert, did not testify as to what kind of examination was necessary before Valium could be prescribed by a medical doctor. Appellant Rogers' contention is without merit. The evidence presented, both expert and otherwise, was sufficient to establish that the appellant was not acting for a legitimate medical purpose when he, on three occasions, prescribed Valium for Agent Sparks.

■ In order for the Government to convict the appellant of counts 3, 5 and 8, it was necessary that it prove that the appellant dispensed the Valium, that he did so knowingly and willingly, and that the appellant in prescribing the Valium was acting other than for a legitimate medical purpose and in the usual course of his medical practice. To prove this, the Government does not have to present proof through the use of expert testimony. *United States v. Rosen*, 582 F.2d 1032 (5th Cir. 1978); *United States v. Bartee*, 479 F.2d 484 (10th Cir. 1973); *United States v. Larson*, 507 F.2d 385 (9th Cir. 1974). In particular, see note 10 on page 1037 of *Rosen, supra.*

■ While the use of expert testimony is both permissible and useful, it is not absolutely necessary as a jury can find that a doctor prescribed controlled substances not in the usual course of his medical practice

and was acting other than for a legitimate medical purpose from evidence received from lay witnesses surrounding the facts and circumstances of the prescriptions. *United States v. Bartee, supra,* at 488.

Appellant further asserts that, as to counts 3, 5 and 8, we must treat this case as if there were no expert testimony touching the prescribing of Valium and as if the evidence disclosed that Valium was prescribed, but no more. Such a case would be an interesting case but not the case before us. Here there was expert testimony that prescribing Valium in combination with other drugs shown to have been prescribed would be action other than for a legitimate medical purpose. There was testimony that prescriptions for Valium were available on request without relation to disorder, complaint or symptom. There was testimony sufficient to a finding that the writing of prescriptions for drugs, including Valium, was the non-medical traffic of this appellant. As covered in the following comments on appellant's next contention, the testimony as to appellant's practices regarding drugs other than Valium was of assistance to the jury in determining whether or not appellant's practice of prescribing Valium on the patient's request solicited by appellant was for a legitimate medical purpose or was induced by some other motive, intent or purpose.

Appellant Rogers' contention that the district court erred in admitting prescriptions written for patients who did not testify is also without merit.

■ These extraneous prescriptions were admitted into evidence predicated on the fact that they were relevant to the issues of appellant Rogers' intent, knowledge, motive, willfulness, plan and scheme. *United States v. Jackson*, 576 F.2d 46 (5th Cir. 1978); *United States v. Ellzey*, 527 F.2d 1306 (6th Cir. 1976).

The district court, in this case, determined that the probative value of the extraneous prescriptions outweighed any potential prejudice. The trial court also gave the jury limiting instructions on the nature

of the evidence, the purpose for which it was introduced and the option of giving it such weight, if any, that they believed should be given to it as an extraneous act in light of all the evidence. Furthermore, there was ample evidence from which it could be inferred that the extraneous prescriptions were issued outside the bounds of professional medical practice as testified to by the Government's expert, Dr. Barr. There was no abuse of discretion on the trial court's decision to admit these further prescriptions given to non-testifying patients and their admission was proper. *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978).

AFFIRMED.