**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Luis E. GUERRERO, M.D., Defendant-Appellant.**

No. 80–1460.

United States Court of Appeals, Fifth Circuit. Unit A

July 16, 1981.

---

W. B. House, Jr., Court-Appointed, Houston, Tex., for defendant-appellant.

Anna E. Stool, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before CHARLES CLARK, TATE and JERRE S. WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

Dr. Luis E. Guerrero was convicted after a jury trial in the United States District Court for the Southern District of Texas on twelve counts of illegally dispensing controlled substances in violation of 21 U.S.C. § 841. On this appeal, Guerrero challenges the admission of certain evidence as extraneous to the indictment against him and inadmissible under the Federal Rules of Evidence, and the sufficiency of the evidence to sustain his conviction. Because we agree that the trial court erroneously admitted extrinsic evidence prejudicial to Guerrero's case, we reverse the convictions and remand the case for a new trial.

We will discuss in part I the sufficiency of the evidence, with regard to which we find no reversible error, and in parts II and III the contentions with regard to the inadmissibility or prejudicial effect of evidence taken, over the defendant's objection, as to acts or conduct extrinsic to the offenses charged by the indictment.

### I. Sufficiency of the Evidence.

Dr. Guerrero was convicted on twelve counts of dispensing controlled substances outside the usual course of professional medical practice for legitimate medical purposes. See 21 U.S.C. § 841(a)(1); 21 CFR § 1306.04(a).[1] These twelve counts involved prescriptions written by Dr. Guerrero for Robert D. Burger, an undercover narcotics officer with the Houston Police Department.

Dr. Guerrero strenuously contends on this appeal that the evidence presented at trial was insufficient to sustain his conviction. To convict Dr. Guerrero, it was incumbent upon the government to prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally. United States v. Rogers, 609 F.2d 834, 839 (5th Cir. 1980).

Guerrero moved for a judgment of acquittal at the close of the government's

---

1. (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;
    . . .
21 U.S.C. § 841(a)(1).
    A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled sub-stances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.
21 CFR § 1306.04(a) (1974).

case and renewed that motion at the conclusion of all the evidence. Thus, in reviewing the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the government, a reasonable jury could conclude that the evidence is inconsistent with any hypothesis of the accused's innocence. *United States v. Suarez*, 608 F.2d 584, 586 (5th Cir. 1979). *See also United States v. Robbins*, 629 F.2d 1105, 1105 (5th Cir. 1980) (on rehearing). As noted by this court in *Suarez*, "[t]he test is not whether the trial judge or the appellate judge concludes that the evidence fails to exclude every reasonable hypothesis of innocence, but rather whether the jury might reasonably so conclude." *United States v. Suarez, supra*, 608 F.2d at 586.

The government's case against Dr. Guerrero is founded upon his dispensation of twelve prescriptions to an undercover governmental agent, Burger, during his six appointments with the doctor over a period of eight months.[2] Burger was ostensibly an overweight long-haul truckdriver in need of medication to stay awake. Dr. Guerrero's defense is that, based on this testimony alone and that of the government's medical expert, the prescriptions were issued in the normal course of medical practice for appropriate medical reasons.

As the district court noted, except for Count Eleven (where, Burger testified, the physician at his request prescribed fifteen tablets of Quaalude for the use of Burger's girlfriend), the government's case is "very weak." The government's expert medical witness admitted that the prescriptions for Burger were consistent with those issued in the course of normal medical practice for a patient with Burger's complaints and ostensible medical needs.

■ Ultimately, however, the district court concluded that a jury issue was presented because of certain testimony by Burger as to exchanges between him and the doctor, by reason of which the jury might have concluded that the doctor knew Burger was not obtaining the prescriptions for normal medical purposes. Although (as was the trial court) we are concerned with the weakness of the government's evidence of unlawful dispensation, in the last analysis we agree with the district court's conclusion that a jury issue is presented: reasonably-minded jurors might conclude that the course of conduct proved permits the inference that the defendant doctor prescribed drugs for Burger's use or disposition on the six occasions in question, knowing that Burger desired to acquire them for some other purpose than for treatment of his medical complaints.

We have attached a detailed summary judgment of the evidence as an appendix to this opinion. Before we summarize the evidence that we find raised a jury question as to whether Dr. Guerrero's prescriptions to Burger were issued in the normal course of a medical practice, we do note that more than half of the evidence in the record concerns extrinsic acts or conduct of peripheral, at best, relevance to the issue of Dr. Guerrero's knowingly unlawful prescription of drugs for other than legitimate medical purposes on the six occasions charged by the indictment, some of which prejudicial extrinsic evidence was erroneously admitted (see parts II and III *infra*).

In *United States v. Rosen*, 582 F.2d 1032, 1035–36 (5th Cir. 1978), this court listed nine factors that prior decisions had recognized under their particular facts were indicative of a doctor's dispensation of drugs for an illegitimate purpose and not in the usual course of a medical practice: (1) Inor-

**2.** On October 23, 1978, Burger obtained a prescription for thirty 200 mg. Tuinal capsules (Count Four) and thirty 15 mg. Desoxyn tablets (Count Five); on November 20, 1978, thirty 200 mg. Tuinal capsules (Count Six) and sixty 30 mg. Ionamin capsules (Count Seven); on December 18, 1978, thirty 200 mg. Tuinal capsules (Count Eight) and sixty 30 mg. Ionamin capsules (Count Nine); on January 19, 1979, thirty Carbitral Kapseals tablets (Count Ten) and sixty 30 mg. Ionamin capsules (Count Eleven); on March 14, 1979, sixty 30 mg. Ionamin capsules (Count Twelve) and thirty Carbitral Kapseals tablets (Count Thirteen); and on May 9, 1979, fifteen 300 mg. Quaalude tablets (Count Fourteen) and sixty 30 mg. Ionamin capsules (Count Fifteen).

dinately large quantities of controlled substances are prescribed; (2) large numbers of prescriptions are issued; (3) no physical examinations are given; (4) patients are warned to fill their prescriptions at different pharmacies; (5) prescriptions are issued to patients known by the physician to be delivering the drugs to others; (6) prescriptions are issued at intervals inconsistent with legitimate medical treatment; (7) the physician uses street slang rather than medical terminology in referring to the drugs prescribed; (8) there is no logical relationship between the drugs prescribed and the condition to be treated; (9) the physician issues more than one prescription on occasions in order to spread them out.[3]

With regard to the twelve prescriptions issued to Burger, only factors (5) and (7) are minimally present, although on at least one occasion extrinsic to the indictment a variation of factor (9) is available:

While the drug prescriptions issued by Dr. Guerrero to Burger were consistent with normal medical practice on the basis of Burger's complaints, the doctor's responses (which the jury could have accepted as jocularly intended, but did not) to Burger's insinuations that he was obtaining the drugs for nonmedical purposes could have been accepted by a reasonable juror as indicative of the doctor's knowledge that Burger was using or disposing of the drugs for nonmedical purposes; and on at least one occasion (Count Eleven) the doctor wrote out a prescription for fifteen tablets of Quaalude to be used by Burger's girlfriend. The government's medical expert (on drug prescriptions in the normal course of a medical practice) concluded, *solely on the basis of these verbal exchanges described to him* (and not on the basis of the prescriptions themselves), that the drugs were "probably not" issued in the normal course of medical practice or that he "would not think so"—*i. e.*, he could not say that the prescriptions themselves under the circumstances could be considered outside the normal course of a medical practice; but the conversational asides in conjunction with the prescriptions became the basis for his belief of a nonlegitimate medical purpose for issuance. Finally, Lorraine Smith, the defendant's former secretary-receptionist, testified that on at least one occasion (not related to the present indictments), Dr. Guerrero had instructed her to make up four false files for nonexistent patients, in which were recorded four prescriptions actually given to a single patient in exchange for a stereo.

Our review of the evidence persuades us that a reasonable jury, believing the testimony of Robert Burger, Dr. Barr, and Lorraine Smith, could conclude that the evidence presented at trial was inconsistent with any hypothesis of Dr. Guerrero's innocence. Thus, although we agree with the district court that the evidence is but marginally sufficient, we can find no fault with that court's determination that the jury was entitled to weigh the credibility of Burger and to determine whether, in light of the testimony of Burger, Barr, and Smith, the government had proved Guerrero's guilt beyond a reasonable doubt. We therefore find no error in the trial court's denial of Guerrero's motion for a judgment of acquittal.

## II. Evidence of Extrinsic Acts: The Testimony of Hayla Gay Carr.

Prior to trial, Guerrero moved *in limine* to exclude the whole of the testimony subsequently given by government witnesses Hayla Gay Carr, Lorraine Smith, and Gwen Durrenberger on the ground that it was extraneous to the offenses charged in the indictment, and therefore inadmissible. That motion was denied.

On appeal, Guerrero contends that the trial court erred in denying that motion with regard to the testimony of Hayla Carr, and, in addition, challenges the admission of particular portions of her testimony as hearsay and as unduly prejudicial.

---

**3.** The *Rosen* court did not, however, hold that evidence of these factors, not otherwise admissible as part of the proof of the actual offense charged, was nevertheless ipso facto relevant and admissible when it concerned acts or conduct extrinsic to the offenses charged by the indictment.

We agree with both contentions and find that prejudicial error was thereby occasioned.

Hayla Carr testified that she had heard from her brother, her cousin, and various friends that pills were obtainable from Dr. Guerrero and that they had obtained pills from him. She noticed five or six young people in Guerrero's waiting room, dressed in blue jeans and T-shirts. Some of these were school acquaintances whom she knew to be drug users. Carr filled out a detailed medical history form and had her weight and blood pressure measured. She complained to Dr. Guerrero of a chronic backache and nervousness. Guerrero talked to her about her personal life, including the fact that she had been separated from her husband for some time. He told her she was underweight. He gave her some sample tranquilizers and a prescription for Percodan (a painkiller) which she filled and shared with her brother and his roommate. (There is no intimation that Dr. Guerrero should have known of this sharing subsequent to his giving Carr the prescription.)

In asserting error in the trial court's denial of his motion *in limine* with regard to Carr, Guerrero contends that Carr's testimony constituted inadmissible evidence of crimes, wrongs, or acts extrinsic to the offenses charged in the indictment against him. *See* Fed.R.Ev. 404(b).[4]

In *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (*en banc*), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), this court rather exhaustively discussed the prerequisites to the admissibility of "extrinsic act" evidence under Rule 404(b). The rule calls for a two step test: (1) The extrinsic act evidence must be relevant to an issue other than the defendant's character, and (2) the evidence must possess probative value that is not substantially outweighed by the danger it presents of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *United States v. Beechum, supra,* 582 F.2d at 911. *See* Fed.R.Ev. 403.[5]

To be relevant under the first step of the *Beechum* test, the evidence sought to be admitted must tend to make the existence of some fact that is of consequence to the determination of the action either more or less probable than it would be without the evidence. *United States v. Beechum, supra,* 582 F.2d at 911. *See* Fed.R.Ev. 401. Where that evidence involves an extrinsic act, its relevancy under *Beechum* is a function of the degree of similarity between the extrinsic act and the offenses charged. *United States v. Beechum, supra.* This means more than the existence of a common characteristic. For the purposes of the *Beechum* test, the common characteristic must be "the significant one for the purpose of the inquiry at hand." *Id.* Thus, where the issue is the defendant's intent to commit the offenses charged, the relevancy of the extrinsic act evidence derives from his having had the same state of mind in the commission of both the extrinsic act and the charged offenses. *Id. See also id.* at 911 n. 15.

Obviously, as this court noted in *Beechum*, extrinsic act evidence can be relevant only if the act was in fact committed and only if the defendant in fact committed it. *Id.* at 912. Thus, as a predicate to the admission of such evidence, the government must show that the defendant did, in fact, commit the extrinsic act. *Id.* at 913. *See*

---

4. Fed.R.Ev. 404(b) reads:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

5. Fed.R.Ev. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Ev. 104(b).[6] The standard of proof in this instance is relatively low: this preliminary fact can be decided against the proponent of the evidence "only where the jury could not reasonably find the preliminary fact to exist." *United States v. Beechum, supra,* 582 F.2d at 913, *quoting* 21 Wright & Graham, Federal Practice and Procedure: Evidence § 5054, at 269 (1977).

■ Once it is determined that the extrinsic act required the same intent as the offenses charged, and that the jury could find that the defendant committed the extrinsic act, the second step of the *Beechum* test is reached: the balancing of the probative value of the extrinsic act evidence against its potential for undue prejudice. *United States v. Beechum, supra,* 582 F.2d at 913. This determination lies within the sound discretion of the trial court, *id.* at 915, and calls for "a commonsense assessment of all the circumstances surrounding the extrinsic offense," *id.* at 914, including prosecutorial need, *id.* at 914, 915, the overall similarity of the extrinsic act and the charged offenses, *id.* at 915, and the temporal proximity of the two, *id.*

■ Applying these standards to the case at hand, we conclude that the testimony of Hayla Carr was improperly admitted. Although the government does not directly address this portion of Guerrero's argument in its brief, it is clear from oral argument that Carr's testimony—like the other extrinsic act evidence presented in this case—was presented as relevant to Guerrero's intent in unlawfully dispensing controlled substances to Robert Burger as charged in the indictment. The problem with this approach is readily apparent. As *Beechum* makes clear, the relevancy of such evidence pivots squarely upon the existence of one crucial element of similarity:

Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's in-

dulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. *The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense.*

*United States v. Beechum, supra,* 582 F.2d at 911 (italics added) (footnote omitted).

In the case at hand, that crucial point of concurrence between the extrinsic act and the charged offenses exists only if Dr. Guerrero unlawfully dispensed controlled substances to Hayla Carr outside the usual course of professional practice for other than legitimate medical reasons. Thus, absent some evidence that Dr. Guerrero acted with unlawful intent in prescribing to Hayla Carr, it cannot be said that Carr's testimony is in any way relevant to the question of his intent in prescribing to Robert Burger. We find no such evidence in the present case.

Carr's testimony shows only that an underweight young woman with low blood pressure, complaining of stress, nervousness, and a chronic backache, received a painkiller and a tranquilizer from a duly licensed physician who was acting on the basis of a detailed medical history. There is nothing to indicate that the drugs prescribed were an inappropriate medical response to Carr's complaints or that the drugs were dispensed in an unusual amount or frequency. There is nothing to indicate that Dr. Guerrero was, or should have been, aware of Carr's admitted propensity to abuse such drugs. There is nothing, in short, that would allow the jury to infer that Guerrero acted with unlawful intent in prescribing to Carr. *See United States v. Jones,* 570 F.2d 765, 768 (8th Cir.1978). *See generally United States v. Greenfield,* 554 F.2d 179, 184–86 (5th Cir.1977) *(dicta).* Thus, we conclude that the extrinsic act evidence elicited from Hayla Carr lacks sub-

---

6. Fed.R.Ev. 104(b) provides:

(b) *Relevancy conditioned on fact.* When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

stantial relevancy with regard to the offenses charged in the indictment.[7]

Even if relevant to some material issue of intent, motive, plan, or scheme, Carr's testimony could not survive application of the second step of the *Beechum* test. At best, its probative value with regard to any or all of those issues is minimal. That minimal probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury presented by Carr's statements concerning the attire of the five or six young people in Guerrero's waiting room, her knowledge of their use of drugs, the hearsay statements made to her by her brother, her cousin, and others, and her dubious motives in seeking treatment from Dr. Guerrero. From those statements, none of which fairly implies unlawful intent on the part of Dr. Guerrero, the jury could have been led to the speculative conclusion that Guerrero acted unlawfully in prescribing to Carr, and thus was less likely to have acted lawfully in prescribing to Burger. The chain of logical

inference leading to that conclusion is far too attenuated in probative force to counterbalance the potential prejudicial impact of those statements, *see United States v. Jones, supra*, 570 F.2d at 768–69, particularly where, as here, the jury received no instruction on the limited use to which extrinsic act evidence may be put in proving unlawful intent, *see United States v. Beechum, supra*, 582 F.2d at 917 & n. 23.

In addition, among the most damaging statements made by Carr were those concerning out-of-court declarations made to her by her brother and her cousin. Carr testified without objection that she had "heard about" Dr. Guerrero from her brother and various friends, and that she went to him in order to obtain pills—Percodan and tranquilizers— which she shared with her brother and his roommate. Following that testimony, counsel for the government began a question which presupposed that Carr's brother and friend had in fact obtained pills from Dr. Guerrero.[8] Dr.

---

**7.** The government argues that two recent decisions of this circuit, *United States v. Rogers*, 609 F.2d 834 (5th Cir.1980) and *United States v. Jackson*, 576 F.2d 46 (5th Cir.1978), mandate affirmance of the district court's admission of this extrinsic act evidence. We disagree.

In *Rogers*, we affirmed the district court's admission into evidence a large number of extraneous prescriptions under the *Beechum* test as relevant to the issues of the defendant's intent, knowledge, motive, willfulness, plan, and scheme. In so doing, however, we noted the existence of "ample evidence from which it could be inferred that the extraneous prescriptions were issued outside the bounds of professional medical practice." *United States v. Rogers, supra*, 609 F.2d at 840. As we have noted, no such evidence exists as to the testimony of Hayla Carr.

In *Jackson*, we affirmed the admission into evidence of some 5,000 extraneous prescriptions as relevant to motive, knowledge and intent. The *Jackson* panel's terse discussion of the issue does not cast much light on the circumstances surrounding the admission of this extrinsic act evidence. *See United States v. Jackson, supra*, 576 F.2d at 49. We note, however, that the issuance of so large a number of prescriptions for the same controlled substance within a relatively short period of time, all for the same number of pills of the same strength, might well be sufficient to give rise to an inference of a pattern of unlawful activity on the part of the issuing practitioner. No such indi-

cations of unlawful intent, or of a common scheme or plan, are present in the testimony of Hayla Carr.

Thus, we do not consider these cases as persuasive authority by which to affirm the trial court's admission of the evidence in question.

**8.** The colloquy proceeded as follows:

Q: When your brother and the friend that you mentioned got pills from this doctor—

MR. BERG (for the defendant): Objection, Your Honor. . . . Those are facts not in evidence. They assume hearsay facts.

THE COURT: All right. Restate your question, please. I will sustain the objection.

Q: (by Ms. Myers, for the government): Do you know whether your brother actually received pills from this doctor?

A: Yes, Ma'am, he did.

Q: How do you know that?

A: Because he told me so; because I saw the prescriptions; because—

MR. BERG: Objection, Your Honor.

THE COURT: I will overrule that objection.

Q: (by Ms. Myers): Continue. Because you saw the prescriptions?

A: Because I saw the prescriptions and I saw the prescriptions filled in bottles.

Q: All right. Did your brother ever share any of those pills with you?

A: Yes, he did.

Q: Do you know if any of your friends or relatives received pills from this doctor?

Guerrero's objection to the question was sustained. Carr then testified in response to direct examination that she knew her brother had obtained pills from Dr. Guerrero because she saw the prescriptions, because her brother told her so, and because she saw the filled prescriptions in bottles. She further testified that she knew her cousin had obtained pills from Dr. Guerrero because he had told her so. Both statements were objected to as hearsay. Carr also testified that her brother shared his pills with her and from her school days she recognized patients in the waiting room as drug users.

The government contends that the challenged statements were not offered to prove the truth of the matter asserted in the extrajudicial declarations, and thus were not hearsay at all. *See* Fed.R.Ev. 801(c).[9] The significance of these extrajudicial assertions, the government argues, lies not in their truth or falsity, but in the mere fact that they were made: they reveal Carr's state of mind—her belief that she could obtain controlled substances from the doctor—when she went to Guerrero's office. The context in which these statements were made, however, belies the government's characterization. Carr had already testified without objection that she went to Guerrero's office to obtain pills because she had heard about Guerrero from her brother and various friends. As the record shows (*see* note 8), she related the challenged out-of-court declarations in response to direct questions from government counsel concerning her knowledge of whether pills *were actually dispensed* by Dr. Guerrero to her brother and cousin. The questions eliciting this testimony were not designed to show merely that a conversation concerning Dr. Guerrero had taken place, or that Carr

believed she could obtain controlled substances from Dr. Guerrero. They were designed to lay the, necessary predicate for Carr's testimony that her brother had shared his pills with her. Even if this testimony had been elicited in order to show its effect on Carr's state of mind, we find it significant to note that Carr's mental state was not relevant to any issue in this case. *See e. g., United States v. Rubin*, 591 F.2d 278, 283 (5th Cir.1979); *United States v. Bobo*, 586 F.2d 355, 371–72 (5th Cir.1978); *United States v. Carter*, 491 F.2d 625, 628–29 (5th Cir.1974). *See also* 4 Weinstein's Evidence ¶ 801(c)[01], at p. 801–70 (1979). The admission of this hearsay evidence alone is sufficient grounds for reversal.

For the reasons delineated above, we conclude that the testimony of Hayla Carr was improperly admitted in violation of Fed. R.Ev. 404(b) and the standards set out in *United States v. Beechum, supra*. In view of the closeness of the evidence in this case, we cannot hold that error harmless. Accordingly, we reverse Dr. Guerrero's conviction as to all counts.

### III. *The Remaining Evidentiary Challenges.*

Because this case must be remanded for a new trial, we will address the remaining issues raised on this appeal in the hope of shedding some light on issues likely to recur. *See United States v. Greenfield, supra*, 554 F.2d 179, 184 (5th Cir.1977).

### 1. *The testimony of Lorraine Smith.*

As with the testimony of Hayla Carr, Guerrero asserts that the whole of Lorraine Smith's testimony should have been excluded as inadmissible extrinsic act evidence violative of Fed.R.Ev. 404(b) and the standards set out in *Beechum*. We do not find merit in this contention.

A: Yes, they did.
Q: And how do you know that?
A: Well, I saw my ex-sister-in-law in his office one day and my cousin went to see him.
Q: Did you talk to your cousin or your sister-in-law at the time you saw them at the doctor's office?
A: I did not. I talked to my cousin about it. I did not see him in the doctor's office. He just told me he had gone.

MR. BERG: Objection, Your Honor. We are getting into hearsay at this point.
THE COURT: I will overrule the objection.
R.III: 185–86.

9. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
Fed.R.Ev. 801(c).

Smith, a former secretary-receptionist in the defendant's office, testified that on one occasion Guerrero had instructed her to make up false medical charts for non-existent patients on which were recorded prescriptions actually issued to a single individual, and that Dr. Guerrero had freely admitted to her on two or three occasions that he was prescribing controlled substances to patients for other than legitimate medical reasons, such as to help a prostitute to get free of her pimp or because it was better for the addict in question to get drugs from him than on the street. She also testified that Guerrero had prescribed controlled substances in exchange for items of merchandise including a stereo, a gun, and some suits, and that Guerrero had consulted her as to the barter value of these items in pills.

▇ This extrinsic act evidence comports with the requirements of *United States v. Beechum, supra.* It is relevant to the issue of Guerrero's unlawful intent in that it shows extrinsic acts, substantially similar to the charged offenses, which require the same state of mind as the offenses charged in the indictment. Further, it tends to show an ongoing practice of unlawful dispensation and is thus relevant to show a common scheme or plan. Smith's testimony contains evidence from which it could be inferred that these extrinsic acts were outside the usual course of professional practice for legitimate medical reasons. *See United States v. Rogers*, 609 F.2d 834, 839–40 (5th Cir.1980). *See also United States v. Beechum, supra*, 582 F.2d at 911–13 & n. 15, 916.

Nor can we say, from our examination of the record that the trial court abused its discretion in determining that the probative value of this evidence was not substantially outweighed by its potential for unfair prejudice. *See United States v. Beechum, supra*, 582 F.2d at 913–15, 916–17. There can be little question that the issue of intent was clearly drawn in this case—in prosecutions for illegitimate medical dispensation, unlawful *intent* is often the crucial issue that separates lawful from unlawful activi-ty—and that extrinsic act evidence was an essential part of the government's proof. The extrinsic acts described in Smith's testimony were contemporaneous with the acts covered in the indictment. There was substantial similarity in legally significant respects between the extrinsic acts and the charged offenses. *See id.* at 917.

We need not here determine whether the absence of a limiting instruction on the use of extrinsic act evidence is in itself sufficient to warrant reversal. We do, however, commend to the district court on remand a consideration of the possible efficacy of such instructions in alleviating the potential for prejudice inherent in such evidence. *See id.* at 917 & n. 23.

### 2. The testimony of Gwen Durrenberger.

Gwen Durrenberger testified that she had received an inquiry from Houston pharmacist Fred Lunsford in February of 1979 concerning prescriptions written by Dr. Guerrero for Quaalude and Desoxyn. Over Guerrero's objection, Durrenberger stated that she had told Lunsford that the substances prescribed were abused drugs, and that Dr. Guerrero was then under investigation. R.III: 161–62.

Guerrero contends that this portion of Durrenberger's testimony exceeded the restrictions imposed by the trial court in denying the motion *in limine* and thus constituted extrinsic act evidence inadmissible under Fed.R.Ev. 404(b).

On this appeal, Guerrero does not challenge the trial court's initial denial of his motion with regard to Durrenberger, nor raise any objection to the testimony of the three other witnesses (Coger, Harvey, and Sortore) who gave evidence relating to the prior investigation into his name and licensing status. We therefore limit our consideration to the matters discussed below. In so doing, however, we do not intend to intimate that this evidence—concerning only prior *investigations* and *inquiries* relating to Guerrero's use of the patronymic "Guerrero" rather than the formal designation appearing on his *license* (which com-

bined the hyphenated surnames of his father and mother, as it is the custom to do in his homeland)—must be found relevant or admissible under the standards set out in *United States v. Beechum, surpa*; nor do we intend to foreclose the district court from reconsidering on remand its initial ruling that such evidence meets the *Beechum* test for admissibility.

In denying Guerrero's motion *in limine* to bar such extrinsic evidence with regard to Durrenberger, the trial court expressly limited her testimony to the fact that she had conducted an investigation into Dr. Guerrero's true name and licensing status in response to inquiries from local pharmacists, and to the results of that investigation. A careful reading of the trial transcript discloses that the challenged testimony does indeed exceed the scope of that ruling.

Durrenberger testified that her investigation into Dr. Guerrero's name and licensing status commenced in response to an inquiry made by pharmacist Jerald Coger in early June of 1978. She stated that she determined at that time that no medical license had been issued in the name "Luis E. Guerrero," and that she had so informed Coger. R.III: 149–52, 153. She then testified that she had received another inquiry concerning Dr. Guerrero from the pharmacist at Blakey's Pharmacy in Houston later in that same month (June, 1978), to which she responded that Guerrero was not a licensed physician and advised the pharmacist to notify the police. R.III: 153–54. Following that testimony, Durrenberger was asked when she discovered that Guerrero was licensed under the name "Luis E. Guerrero-Ramirez." She responded that during the police investigation following the arrest "of the two people who brought the prescription into the pharmacy to be filled" Dr. Guerrero was contacted and at that time gave his "correct" name. R.III: 154–57.

The clear reference in those statements is to the Blakey's Pharmacy incident, arising in June of 1978. Thus, although the exact date of the discovery of Dr. Guerrero's true licensing status is never brought out, it is clear that the discovery occurred during the course of a police investigation that was commenced in June of 1978. The objected-to Lunsford inquiry (where Durrenberger testified that she had told Lunsford that the substances prescribed were abused drugs and that Dr. Guerrero was under investigation) arose in February of 1979, some eight months *after* the inquiry that led to the discovery of Guerrero's true licensing status, and contemporaneously with the police investigation of Guerrero himself that ultimately led to his prosecution. It seems highly unlikely, therefore, that the testimony relating to the Lunsford inquiry had any thing at all to do with the investigation into Guerrero's name and licensing status, or that the investigation referred to in that testimony was the *licensing* investigation rather than the *criminal* investigation conducted by Officer Robert Burger.

Thus, it would appear that Durrenberger's testimony concerning the Lunsford inquiry does exceed the scope of the trial court's ruling on Guerrero's motion *in limine*. Indeed, Durrenberger's somewhat confusing testimony may well have exceeded permissible bounds at several points. On this appeal, however, Guerrero challenges only two very specific statements: (1) That Durrenberger told Lunsford the prescribed substances were abused drugs, and (2) that Durrenberger told Lunsford Dr. Guerrero was then under investigation.

■ As to those statements, Guerrero contends that they exceeded the scope of the trial court's ruling on the motion *in limine* and thus were improperly admitted. We have no difficulty in agreeing with Dr. Guerrero's contention with regard to the second statement. That statement had nothing to do with Durrenberger's investigation into Guerrero's name and licensing status, and thus was effectively excluded by the trial court's ruling. Guerrero objected to the statement at trial on those very grounds. The district court's admission of the statement over that objection was therefore improper. The first of the challenged statements, however, was not objected to at trial on these grounds. Guerre-

ro's sole objection was that a proper predicate had not been laid for Durrenberger's characterization of the prescribed medication as abused drugs. R.III: 161. Although a motion *in limine* will itself preserve error for the purposes of appeal in some circumstances, *see e. g., Reyes v. Missouri Pac. R. R.,* 589 F.2d 791, 793 n.2 (5th Cir. 1979), we feel it was incumbent upon Guerrero to inform the trial court of the nature of his further objection in this instance. His failure to do so forecloses this challenge on appeal. *See* Fed.R.Ev. 103(a)(1).

We conclude, therefore, that Durrenberger's testimony concerning her remarks to pharmacist Lunsford about the then-ongoing investigation of Dr. Guerrero exceeded the scope of the trial court's ruling on the motion *in limine*, and thus was improperly admitted. Considering our earlier conclusion of reversibility with regard to the testimony of Hayla Carr, we need not now determine whether these statements prejudiced Guerrero's case. We merely point out this analysis to the district court, should these issues arise on retrial.

### Conclusion

For the reasons delineated above, we conclude that the testimony of Hayla Gay Carr was improperly admitted in violation of Fed.R.Ev. 404(b). That error was not harmless, and we must therefore reverse the convictions as to all counts. Although we view the evidence presented in this case as marginal, we cannot find that evidence insufficient to sustain a conviction so as to preclude retrial should the government choose that course.

REVERSED AND REMANDED.

### APPENDIX

#### I.

We think the testimony of Robert Burger (the undercover agent), Dr. Robert Barr (the government's expert witness on normal medical practice), and Lorraine Smith (Dr. Guerrero's secretary-receptionist), can be said to raise a jury issue as to Dr. Guerrero's unlawful intent in prescribing the drugs. The testimony of these three witnesses is as follows:

*Robert Burger*:

Burger visited Dr. Guerrero's office on six separate occasions between October 1978 and May 1979, obtaining on each visit prescriptions for two controlled substances. Burger's testimony describing these visits forms the core of the government's case.

Burger first visited Dr. Guerrero's office on October 23, 1978, claiming to have been referred by another patient. He was weighed and his pulse rate was taken, but no other physical examination was conducted. Burger told Dr. Guerrero that he was a long-haul truckdriver and needed medication to help him stay awake on the road. Burger testified that Guerrero asked him how he was going to get to sleep after taking the "dope" to stay awake, and warned him not to take the "dope" continuously because he might become addicted to it. He obtained prescriptions for thirty capsules of Desoxyn (an "upper") and thirty capsules of Tuinal (a "downer"). Burger did not have those prescriptions filled. On cross-examination, Burger testified that he had filled out a detailed medical history questionnaire, and that Dr. Guerrero had told him to take vitamins, to incorporate bran into his diet, and to increase his exercise regimen by jogging and jumping rope in order to avoid fatigue while driving.

Burger returned to Dr. Guerrero's office on November 20, 1978. He was again weighed and his blood pressure was taken, but no other physical examination was conducted. Burger testified that Dr. Guerrero cautioned him about gaining weight, expressing concern that the "Feds" might "get after him" for prescribing the medication, and stating that "the heat was on" doctors at that time. Burger further testified that he asked Guerrero to prescribe "Yellow Mollies" (Ionamin) for him rather than Desoxyn. Dr. Guerrero agreed, and Burger received prescriptions for sixty capsules of Ionamin (the "Yellow Mollies," an "upper") and thirty capsules of Tuinal (a "downer"). Burger did not fill these prescriptions.

Burger's third visit to Dr. Guerrero occurred on December 18, 1978. On this occasion, he carried a small tape recorder concealed in his shirt pocket; however, the recording later proved to be inaudible. Burger was again weighed and his blood pressure was taken through his shirt. Burger testified that Guerrero again cautioned him about losing weight, stating that the "federal people" could and would get his license for prescribing this medication without a concomitant weight loss in the patient. Burger reassured Guerrero that he was filling the prescriptions on the road, not in Houston, to which Guerrero responded that he did not want people to think he was running a "black market" in these drugs. Burger again requested "Yellow Mollies" (Ionamin) from Guerrero. He received prescriptions for thirty capsules of Tuinal and sixty capsules of Ionamin, both of which Burger had filled in Houston.

Burger returned a fourth time to Dr. Guerrero's office on January 19, 1979, this time "wired" with a concealed transmitter. Again, however, the recording of the visit proved to be inaudible. As on the previous visits, Burger was weighed and

his blood pressure was taken. Burger testified that Dr. Guerrero again cautioned him about his failure to lose weight and asked whether he was taking all the pills that were prescribed. Burger responded that he was not—that he had sold some of the pills at a truck stop in Arizona. Guerrero did not comment on this admission. He wrote out prescriptions for sixty capsules of Ionamin ("Yellow Mollies") and thirty Carbitral Kapseals tablets, stating that the writing of this prescription would be the end of his practice. (There is some indication in the record of Burger's testimony that Dr. Guerrero refused to write a prescription for Tuinal on this occasion, substituting in its stead the less strictly controlled Carbitral. See R.IV: 359–61.) Burger filled the Ionamin prescription, but did not fill the prescription for Carbitral.

On March 14, 1979, Burger paid a fifth visit to Dr. Guerrero's office. As before, he was weighed and his blood pressure was taken. Noting that Burger had gained weight since his previous visit, Guerrero told him in a "kidding" manner, "If you wouldn't sell all the dope in Phoenix, you'd lose some weight." Burger did not respond. He obtained on that visit prescriptions for sixty capsules of Ionamin ("Yellow Mollies") and thirty Carbitral Kapseals tablets. Burger had only the Ionamin prescription filled.

Burger's final visit occurred on May 9, 1979. Again, an attempt to record the visit produced no results. Burger was weighed and his blood pressure taken. Burger testified that on this occasion he asked Guerrero for a prescription for Quaalude because he had a girlfriend who "like to get down" with that drug. Guerrero laughed and responded that Burger should not need dope "to get close to a girl." Guerrero wrote prescriptions for sixty capsules of Ionamin and fifteen Quaalude tablets. Burger had both these prescriptions filled.

General cross-examination of Officer Burger revealed that, although Guerrero gave no oral instructions to Burger concerning proper dosages of the medications prescribed, such instructions were included in the prescriptions and on the labels of the pill bottles. Cross-examination further revealed that the medical history questionnaire filled out by Burger on his initial visit was indeed quite detailed, and that Dr. Guerrero did make notes concerning Burger's condition during the several visits.

*Dr. Robert H. Barr:*

Dr. Robert H. Barr, a licensed physician and pharmacist, appeared as the government's medical expert. Dr. Barr testified that, based on the face of the prescriptions alone, he could not form an opinion as to whether the drugs prescribed to Burger had been prescribed in the usual course of professional practice for legitimate medical purposes. Dr. Barr further testified that, based on the prescriptions and the medical information gathered from the limited physical examinations conducted and the medical history form filled out by Burger, each set of prescriptions could have been issued in the usual course of professional

practice for legitimate medical reasons. When asked to consider the same prescriptions in light of the same medical information, but taking into account the conversations recounted by Burger during his various visits, Dr. Barr testified that he "wouldn't think" that the prescriptions were issued in the usual course of professional practice for legitimate medical reasons.

*Lorraine Smith:*

Lorraine Smith, formerly the defendant's secretary-receptionist, testified at some length about Dr. Guerrero's practice. Her testimony concerned extrinsic acts or conduct, not the offenses charged. Most pertinently, she testified that on one occasion Guerrero instructed her to make up four false files for nonexistent patients, in which were recorded prescriptions actually given to a single patient in exchange for a stereo. She also testified that Dr. Guerrero had recorded on one patient's chart that, "Patient is a whore. Needs medication [Desoxyn and Tuinal] to be—get away from pimp." She further testified that Guerrero had exchanged pills for items of merchandise, including a stereo, a gun, and some suits, and that he had consulted her as to the barter value of those items in pills. Smith testified that Guerrero had admitted prescribing pills for nonmedical reasons, stating that some of his patients were "junkies" who needed the drugs and that it was better for them to obtain the pills from him than to get them on the street.

## II.

Four witnesses were called to testify about an official investigation into the name used by Dr. Guerrero in his medical practice. The physician, who is an Hispanic American, was licensed in the formal name of "Guerrero-Ramirez" (a hyphenated joining of his father's name, "Guerrero," and his mother's name, "Ramirez," consonant with the Hispanic tradition of listing both parents' names), but he issued prescriptions in his patronymic name of "Guerrero," the name by which he was known (and indeed the name by which he was indicted). The evidence of this investigation of misuse of the name, under the circumstances, was of doubtful and at best peripheral relevance to the issue of whether Dr. Guerrero had unlawfully prescribed drugs to Burger on the six occasions in question.

Two Houston area pharmacists, Jerald R. Coger and James Harvey, testified that they had become suspicious of certain prescriptions written by Dr. Guerrero for controlled substances and had alerted the Texas Board of Medical Examiners. Coger stated that he made a routine confirmation call to Dr. Guerrero's office in June of 1978 when a young woman presented a prescription for forty Dilaudid tablets ostensibly signed by Dr. Guerrero. His suspicions were aroused when Guerrero told him that he had written the prescription for fourteen rather than forty tablets, and when the woman left the pharmacy "abruptly" after speaking to the doctor. Coger testified that he was also suspicious because he had received "several" other prescriptions for

controlled substances written on Dr. Guerrero's prescription pad. Coger sent a copy of the prescription to the Board, and some time later (in August of 1978) wrote a letter to Officer Burger listing ten physicians (including Dr. Guerrero) who were writing "a lot" of such prescriptions. Harvey testified that in August of 1979 he sent copies of prescriptions written by Dr. Guerrero for controlled substances to the Board. Harvey stated that he became suspicious of these prescriptions because of the number being received by the pharmacy and because of the appearance of the persons presenting them to be filled ("hippie types").

Gwen Durrenberger, an investigator for the Texas Board of Medical Examiners, testified that she had received an inquiry from pharmacist Jerald Coger in June of 1978 concerning prescriptions for controlled substances purportedly written by Dr. Guerrero. Upon receiving copies of the prescriptions and Dr. Guerrero's business card from Coger at her request, she discovered that there was no medical license issued in the name "Luis E. Guerrero." She testified that she informed Coger of that fact. She testified further that in June of 1978 she had occasion to view prescriptions written by Dr. Guerrero at the request of the pharmacist at Blakey's Pharmacy in Houston. She informed that pharmacist that, according to the Board's records, Guerrero was not a licensed physician and advised him to notify the police. Upon inquiry, Durrenberger stated that she had spoken to a total of about nine pharmacists in the Houston area concerning prescriptions written by Dr. Guerrero. Durrenberger testified that investigation pursuant to the Blakey's Pharmacy incident revealed that Guerrero did hold a current medical license under the name "Luis E. Guerrero-Ramirez." She testified further that in February of 1979 she received an inquiry from Houston pharmacist Fred Lunsford concerning prescriptions for controlled substances written by Dr. Guerrero. She stated that she had told Lunsford that the substances prescribed (Quaalude and Desoxyn) were "abused drugs" and that Dr. Guerrero was currently under investigation.

John H. Sortore, Director of Investigations for the Texas Board of Medical Examiners, testified that in December of 1976 Dr. Guerrero was informed by the Board that he was required to use his full name as it appeared on his license in all matters connected with his practice, and that if he wished to use a shortened version of his name he should obtain a duplicate license in that name. He further testified that he spoke with Dr. Guerrero over the telephone in January of 1977, and repeated the Board's requirement. Dr. Guerrero has not applied for a duplicate license.

III.

Two witnesses testified as to other extrinsic evidence, Hayla Carr and Delinda Wilker. For reasons noted in our opinion in chief, we reverse on the admission of Hayla Carr's testimony. This testimony is as follows:

Hayla Gay Carr, a former patient of Dr. Guerrero's, testified that she went to Dr. Guerrero in the summer of 1978 in order to obtain drugs for nonmedical reasons. She stated that she had heard about Dr. Guerrero from her brother and "various friends." Carr testified that she knew her brother had obtained pills from Dr. Guerrero because her brother had told her so, because she had seen the prescriptions and the pill bottles, and because her brother had shared his pills with her. She also stated that other friends and relatives had told her they had obtained pills from Dr. Guerrero. Carr visited Dr. Guerrero's office only once. In the waiting room she saw five or six young people dressed in jeans and T-shirts, some of whom she knew to be drug users. She testified that she was weighed and that Dr. Guerrero had "kind of pinched [her] arm" and told her she was underweight. Carr told Dr. Guerrero that she had a backache and that she was nervous during the day. Guerrero gave her sample tranquilizers and a prescription for Percodan (a painkiller). She paid $35 for the visit. On cross-examination, Carr testified that she was a drug abuser and that she had had her blood pressure taken and had filled out a detailed medical history form. She further stated that she had told Dr. Guerrero that she had suffered from a backache for several months and had been separated from her husband for more than a year.

Finally, Delinda S. Wilker, a Houston police officer, testified that she had accompanied Officer Burger to Guerrero's office dressed in jeans and wearing long brown hair in order to fit in with Guerrero's clientele.

REVERSED and REMANDED.