UNITED STATES of America,
Plaintiff-Appellee,

v.

Roosevelt Peter JACKSON,
Defendant-Appellant.

No. 77–5636
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

July 5, 1978.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

William L. Harper, U. S. Atty., Robert A. Boas, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before THORNBERRY, GODBOLD and RUBIN, Circuit Judges.

THORNBERRY, Circuit Judge:

This is one of a growing number of cases involving doctors who "deal" drugs.[1] Appellant Roosevelt P. Jackson, M.D., established a "mental health clinic" apart from his regular practice after suffering a drop in income following his loss of surgical privileges at certain Atlanta hospitals. The clinic quickly became known as a source of "Quaalude," the commercial name for the depressant methaqualone—a Schedule II controlled substance that enjoys considerable popularity among the drug set.

In January 1977 a federal grand jury in Atlanta returned a 76-count indictment against Dr. Jackson, charging that he had unlawfully dispensed controlled substances in violation of 21 U.S.C. § 841(a)(1).[2] Forty-two counts were eventually submitted to the jury, which returned verdicts of guilty on all counts. Dr. Jackson received five-year prison sentences on each count, to run concurrently, plus five years probation. All but six months of the jail term was suspended.[3]

On appeal, Dr. Jackson contends that (1) the indictment did not properly charge all elements of the offense; (2) the district court erroneously failed to order physical and mental examinations of the witnesses; (3) the district court erred in admitting into

Marvin S. Arrington, John J. Goger, Atlanta, Ga., for defendant-appellant.

1.  E. g., United States v. Boettjer, 569 F.2d 1078 (9 Cir. 1978); United States v. Davis, 564 F.2d 840 (9 Cir. 1977); United States v. Greenfield, 554 F.2d 179 (5 Cir. 1977); United States v. Fellman, 549 F.2d 181 (10 Cir. 1977); United States v. Hooker, 541 F.2d 300 (1 Cir. 1976); United States v. Hicks, 529 F.2d 841 (5 Cir.), cert. denied, 429 U.S. 856, 97 S.Ct. 154, 50 L.Ed.2d 133 (1976); United States v. Ellzey, 527 F.2d 1306 (6 Cir. 1976).

2.  21 U.S.C. § 841(a)(1) provides, in part:
    (a)   Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
    (1)  to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance

3.  Under a special condition of probation, Dr. Jackson was required to pay a fine of $250 on each count, a total of $10,500.

evidence 5,000 prescriptions for methaqualone issued by Dr. Jackson; (4) the district court improperly limited cross-examination of a government witness; and (5) the evidence was insufficient to support his conviction. For the reasons stated below, we affirm.

■ In *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975), the Supreme Court held that physicians registered to dispense drugs may be prosecuted under 21 U.S.C. § 841(a)(1) when "their activities fall outside the usual course of professional practice." Dr. Jackson argues that the indictment in his case was defective in that it failed to charge that he had dispensed controlled substances in such fashion, *i. e.,* without legitimate medical purpose. Even if an indictment charging a physician under § 841(a)(1) were required to contain an allegation of activity outside the scope of usual professional practice,[4] we think the indictment in the instant case passes muster. The indictment alleged, in pertinent part:

> That on or about the dates hereinafter specified, within the Northern District of Georgia, the defendant, ROOSEVELT PETER JACKSON, who at all times hereinafter mentioned was a physician licensed and registered by the United States and by the State of Georgia to dispense, administer, and conduct research with respect to controlled substance in the course of professional practice or research, under the guise and artifice of operating a "mental health clinic" and/or a drug abuse program, did knowingly, intentionally and unlawfully dispense the controlled substance(s) listed below to the person(s) listed below, in

violation of Title 21, United States Code, Section 841(a)(1).

Although the indictment does not state that Dr. Jackson acted outside the scope of professional practice, it does allege a more specific activity, *i. e.,* that he dispensed drugs unlawfully "under the guise and artifice of operating" his clinic. Even a casual reading of the indictment makes clear that Dr. Jackson was alleged to have utilized his clinic as a "front" for dealing drugs, and the language obviously embraces an activity lacking legitimate medical purpose. The indictment is thus sufficient although it lacks the "magic words" of *Moore. See United States v. McGough,* 510 F.2d 598, 602 (5 Cir. 1975); *United States v. Romero,* 495 F.2d 1356, 1359 (5 Cir.), *cert. denied,* 419 U.S. 995, 95 S.Ct. 307, 42 L.Ed.2d 267 (1974).

Dr. Jackson next argues that the district court erroneously denied his motion for physical and psychiatric examination of thirteen witnesses who testified how they obtained prescriptions from him. Because all of these "patients" were drug users, he contends that the examination results might have shown them incompetent to testify or would have been relevant for impeachment purposes.

■ The district court has broad discretion in determining whether to order such examinations. *Gurleski v. United States,* 405 F.2d 253, 267 (5 Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2127, 23 L.Ed.2d 765 (1969). We find no abuse here. The fact that a witness is a narcotics user goes not to his competency, but to his credibility. *United States v. Killian,* 524 F.2d 1268, 1275 (5 Cir. 1975), *cert. denied,* 425

---

4. We leave this question, apparently one of first impression, to another day. Some reported cases have involved indictments utilizing such language as "not in the course of usual professional practice" and "not for a legitimate medical purpose," *e. g., United States v. Boettjer, supra,* 569 F.2d at 1081, and this is undoubtedly the safer practice. We note, however, that the Supreme Court did not address the question in *Moore,* and that under the predecessor to the present narcotics statutes no such allegation was required. *United States v. Ramzy,* 446 F.2d 1184 (5 Cir.), *cert. denied,*

404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 544 (1971). The general rule, followed in *Ramzy,* is that the government need not negative statutory exceptions. *See United States v. Cook,* 17 Wall. (84 U.S.) 168, 21 L.Ed. 538 (1897); *McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922); 21 U.S.C. § 845(a)(1). Physicians and other medical professionals are excepted from the provisions of § 841(a)(1) if properly registered under § 822 and if they dispense drugs in the usual course of professional practice. *United States v. Moore, supra; see also* 21 U.S.C. § 802(20).

U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Gurleski v. United States, supra; see also* Rule 601, Fed.R.Evid. Defense counsel extensively cross-examined the "patients" about their drug experiences and also had access to questionnaires filled out by the "patients" when they first visited Dr. Jackson, as well as the results of the doctor's own examination of them. Regarding the requested mental examination, psychiatric opinions as to a witness' reliability in distinguishing truth from fantasy is inadmissible for impeachment purposes, for it invades the jury's province to make credibility determinations. *United States v. Wertis*, 505 F.2d 683, 685 (5 Cir. 1974), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975). Moreover, a court-ordered medical examination is an infringement on a witness' privacy, and this factor must be taken into account by the district court. As the district judge said in the instant case:

> Such an examination may seriously impinge on a witness' right to privacy, very high on any scale of balancing rights. The examination itself could serve as a tool of harassment, and the likelihood of an examination could deter witnesses from coming forward, producing a chilling effect on crime detection.

■ Dr. Jackson also complains that the district court improperly admitted into evidence more than 5,000 prescriptions for methaqualone, written over a fifteen-month period, that did not relate to any of the counts of the indictment. We disagree. This evidence of "other acts" was relevant to Dr. Jackson's motive, *i. e.*, it helped establish that he was in the business of writing prescriptions for drugs commonly used "on the street". Moreover, each prescription was for twenty-four tablets and each had been filled at the same pharmacy. The prescriptions were relevant for purposes of Dr. Jackson's knowledge that he was acting outside the usual course of professional practice and his intent to dispense the drugs unlawfully. Rule 404(b), Fed.R.Evid.; *see*

*also United States v. Greenfield*, 574 F.2d 305 (5 Cir. 1978); *United States v. Ellzey*, 527 F.2d 1306 (6 Cir. 1976). In admitting the evidence, the district judge obviously determined that its probative value outweighed any potential prejudice. Rule 403, Fed.R.Evid. That determination is to be upheld "unless an abuse of discretion is found," *United States v. Kirk*, 528 F.2d 1057, 1061 (5 Cir. 1976), and we find none here.[5]

■ One of the government's witnesses was a newspaper reporter from the Atlanta Constitution, who testified about an interview he conducted with Dr. Jackson in preparation for an article on Jackson's "drug practice." There was considerable consternation about the reporter's direct testimony, and the district court eventually ruled that he could testify only about "direct statements by the doctor to the reporter." On cross-examination, defense counsel sought to go beyond matters covered on direct testimony by inquiring into the news story's contents and other aspects of the interview, but the district court refused to permit this line of questioning. Dr. Jackson contends that the district court impermissibly limited cross-examination.

Under the "restrictive" federal practice, cross-examination is generally to be "limited to the subject matter of the direct examination and matters affecting the credibility of the witness," although the district court has discretion to permit inquiry into additional matters. Rule 611(b), Fed.R.Evid. Placing restrictions on cross-examination is within the sound discretion of the district court, *United States v. Zepeda-Santana*, 569 F.2d 1386, 1389 (5 Cir. 1978); *United States v. Onori*, 535 F.2d 938, 945 (5 Cir. 1976); *United States v. Ramirez*, 533 F.2d 138, 140 (5 Cir.), *cert. denied*, 429 U.S. 884, 97 S.Ct. 235, 50 L.Ed.2d 165 (1976), and we find no abuse of discretion here.

■ Finally, Dr. Jackson raises a sufficiency of the evidence challenge by con-

---

**5.** We also note that in a sense the evidence was merely cumulative, since a newspaper reporter had previously testified of an interview in which Dr. Jackson had stated that he had prescribed methaqualone for 5,000 patients during a four-month period.

tending that the district court should have granted his motion for acquittal. The evidence, viewed in a light most favorable to the government,[6] is more than sufficient to support the conviction. After losing surgical privileges at two Atlanta hospitals, Dr. Jackson established a "mental health clinic" apart from his regular practice. He admitted to the newspaper reporter that the only way he could maintain his previous income level was by treating large numbers of patients with methaqualone. In addition, the reporter testified that Dr. Jackson said he had prescribed methaqualone for some 5,000 persons within a four-month period and acknowledged that these people came to him for the drug because it was cheaper than buying it "on the street," despite the "office visit" charge of $20 or $25.

Thirteen persons for whom he had prescribed the drug testified that they went to Dr. Jackson after hearing that it was easy to obtain methaqualone from him. All of these "patients" had had previous drug experiences, and some even admitted on a questionnaire filled out for the doctor that they took drugs to "get high" or "escape from reality." Nonetheless, they received prescriptions for methaqualone after filling out the questionnaires and receiving perfunctory physical examinations. Two medical experts testified that the examinations were inadequate and that the records kept by Dr. Jackson were also insufficient. Moreover, one expert stressed the importance of adequate warnings to the patient, and several "patients" said Dr. Jackson did not give any such warnings or other instructions as to the proper use of the drug. Moreover, the prescriptions were all for the same amount of methaqualone—twenty-four 300 milligram tablets. This evidence is clearly sufficient to establish a course of medical activity well outside the usual professional practice.

AFFIRMED.

6. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.