**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Alex J. RAINERI, Defendant-Appellant.**

No. 81–1394.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1981.

Decided Feb. 8, 1982.

Rehearing and Rehearing In Banc Denied March 24, 1982.

Daniel W. Linehan, Linehan Law Offices of Madison, Madison, Wis., for defendant-appellant.

Frank M. Tuerkheimer (Then-U. S. Atty.), Madison, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and PELL, Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

After hearing the testimony and deliberating upon the evidence, a jury at Madison, Wisconsin, found the defendant guilty on all five counts of an indictment. On appeal, he raises numerous issues. We affirm the convictions.

The first three counts charged the defendant with having caused travel and the use of a facility in interstate commerce to promote a Hurley, Wisconsin, business en-terprise involving illegal prostitution.[1] The fourth count charged that he had knowingly made false and material declarations before a federal grand jury.[2] The fifth charged that the defendant had endeavored to obstruct the administration of justice by having a prospective grand jury witness threatened in connection with her prospective testimony.[3]

The evidence showed the defendant's extensive involvement in operating the Showbar, a Hurley, Wisconsin, business enterprise involving prostitution. It also showed that certain checks issued in promoting that enterprise and some linen used on the beds where the prostitutes worked had crossed state lines. Trial evidence also demonstrated that the defendant testified falsely before the grand jury when he stated that he did not travel to and from Reno, Nevada, with Cira Gasbarri in September and October, 1978. There was also proof that after the grand jury asked the defendant whether Patricia Colossaco, a Showbar bartender, had ever told him that there was prostitution at the Showbar, he told Colossaco's brother to tell her to quit telling lies about the defendant, to keep her mouth shut, and if she did not listen to her brother, the defendant would get someone else to talk to her.

The defendant's arguments fall into three categories: objections to pretrial rulings; disputes over trial rulings; and challenges to the sufficiency of the evidence.

## I

### PRETRIAL RULINGS

#### A. Location of Trial

Raineri moved to transfer the trial of this case from Madison to Hurley or Superior. A magistrate denied the motion after assessing the probable convenience and inconvenience to defendant resulting from trial at either of those locations. The district court denied reconsideration. *United States v. Raineri*, 521 F.Supp. 30, 32, 33 (W.D.Wis.1980).

---

1. 18 U.S.C. §§ 2 and 1952.

2. 18 U.S.C. § 1623.

3. 18 U.S.C. § 1503.

Rule 18, Fed.R.Crim.P., requires the court to "fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice."

We are not persuaded that there was an abuse of discretion. The magistrate concluded, for reasons set forth in his decision, that trial at either of the requested locations would result in greater inconvenience to defendant and the witnesses. Moreover, Rule 18 requires due regard to the prompt administration of justice. In our view this requires consideration of the disruption of the functioning of the court caused by trial away from its customary headquarters.

Although defendant and a number of expected witnesses lived at Hurley, approximately 300 miles north of Madison, no federal court quarters exist there. The former federal courtroom at Superior, one of the places specified by statute for holding court, and approximately 100 miles west of Hurley, has been dismantled. The volume of cases in the Western District of Wisconsin and the limited personnel, facilities, and other resources available for dealing with this work have resulted in an increased centralization of judicial activity at the district's largest population and litigation center, Madison, where both the only district judge in regular active service at the time of trial and the district's only senior judge reside. In view of these facts, the adverse effect on the prompt administration of justice of holding a trial at Superior or Hurley must be significant, even assuming availability of a state court courtroom at either of these places without cost to the United States. *See* 28 U.S.C. § 142.[4]

### B. Jury Selection

Defendant also argues that the Jury Selection Plan, under which his jury was selected, no longer complies with the Jury Selection and Service Act, 28 U.S.C.

§§ 1861–69. Specifically, the claim is that citizens residing in many counties of the district are not currently and probably never will be considered for service on a petit jury.

The situation on which defendant predicates his challenge may be described as follows:

There are five statutory places for holding court within the district: Eau Claire, La Crosse, Madison, Superior, and Wausau. 28 U.S.C. § 130(b). In years past, the bulk of activity was at Madison, but jury trials were held to some extent at the other places. When the district court adopted its Jury Selection Plan under the Act, it placed every county in one of five "divisions," each of which surrounded one of the five places where court was held. There are no statutory divisions in the district, and the "divisions" in the Plan complied with § 1869(e)(2). Although grand jurors are selected from throughout the district, petit jurors are selected from the "division" in which the place of trial is located. As time went by the caseload for the district (with only one judgeship authorized until 1978) increased so as to become one of the highest per-judge caseloads in the nation. More and more of the judicial activity was necessarily concentrated at Madison. In recent years trials have come to be held only at Madison, except for some at Eau Claire. The district court quarters in the other places have been closed.

Defendant points to the policy stated in § 1861 "that all citizens shall have the opportunity to be considered for service on ... petit juries ...." Section 1863(a) requires that a district Plan "shall be designed to achieve the objectives" of § 1861. Defendant plausibly asserts that currently, at least, residents of the La Crosse, Superior, and Wausau divisions are not considered for service on petit juries. Essentially this

---

**4.** The legitimate factors which have led to the concentration of judicial activity at the Western District's Madison headquarters and the consequent dismantling of other federal courthouses distinguish this case from *United States v. Fernandez*, 480 F.2d 726, 730 (2d Cir. 1973), which expressed disapproval when the only person convenienced by a trial away from the headquarters of a multi-judge district was the judge to whom the case had been assigned, and *United States v. Burns*, 662 F.2d 1378 (11th Cir. 1981).

is a claim that a plan which originally complied with the Act has fallen away from compliance because of changed circumstances.

■ Defendant's motion to change the place of trial would not have remedied the situation, except in the sense that some residents of the Superior division would have been members of his jury. In any event his motion did not preserve his claim. Congress prescribed a motion to stay proceedings as the exclusive means by which an accused may challenge a petit jury on the ground that it was not selected in conformity with the Act. 28 U.S.C. § 1867(a), (d), and (e).

Defendant did move to dismiss the indictment on the statutory ground just described, also asserting a constitutional right to trial by a jury drawn from the entire district, a claim he no longer presses. The motion was denied. *United States v. Raineri*, 521 F.Supp. 30, 32, 33, 36–38. A motion to dismiss the indictment is included in § 1867(a) and (e) as one of the exclusive remedies for challenging a jury not selected in conformity with the Act.

■ The text of § 1867(d)[5] makes clear that although the remedy for noncompliance in grand jury selection may be either a stay pending a conforming selection of a grand jury or a dismissal of the indictment, the only remedy for noncompliance in the selection of a petit jury is a stay pending the selection of a petit jury in conformity with the Act. We conclude, therefore, that the exclusive procedure for a challenge to the selection of petit jurors is a motion for stay of proceedings.

The magistrate concluded that although petit jurors are "routinely" selected in only two divisions, the possibility that trials might be held at some time in the La Crosse, Superior, or Wausau divisions keeps the district's Jury Selection Plan in compliance with the Act. Apparently the district court agreed. In addition there may be some question whether Congress intended that a litigant whose jury was otherwise properly selected from a division of a district could challenge the particular type of defect alleged here, involving, as it would, interests of citizens in an opportunity to be considered for service rather than the more traditional interests of litigants in the jury selection process.

Because defendant did not resort to the exclusive remedy provided, we do not reach either of these questions.

## C. The Speedy Trial Act

■ The defendant asserts that the commencement of trial on November 24, 1980, more than five months after both the June 23 arraignment and the June 6 indictment violated the Speedy Trial Act, 18 U.S.C. §§ 3161–3174. That act required the trial to begin within seventy days of the arraignment; 18 U.S.C. § 3161(c)(1); but excluded from the seventy days certain periods of delay. 18 U.S.C. § 3161(h). One provision excludes the delay between the filing and the prompt disposition of any pretrial motion. 18 U.S.C. § 3161(h)(1)(F). Another excludes "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(J). The defendant filed twelve motions on June 23 and seven motions on July 7, the last day on which the magistrate's June 23 pretrial order allowed the parties to file motions. In accord with the magistrate's pretrial order, the prosecution responded to the motions on July 18. The defendant filed a July 25 motion requesting the disqualification of the district judge; and a July 28 affidavit in support of his various motions. On Au-

---

**5.** 28 U.S.C. § 1867(d) provides in part: "If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title."

gust 1, the prosecutor filed the final affidavit in opposition to the defendant's pretrial motions. This affidavit responded in part to the defendant's July 25 motion. Thus, the period from June 23 until August 1 does not count toward the seventy days because it was occupied with the prompt disposition of the motions the defendant filed on three different dates. 18 U.S.C. § 3161(h)(1)(F).

The magistrate had some of these motions under advisement until October 28. (He had decided some of them and made recommendations on others on October 3, October 7, October 10, and October 15.) It is reasonable to attribute and exclude thirty of the days between August 1 and October 28 to the motions under advisement. 18 U.S.C. § 3161(h)(1)(F) & (J).[6] *United States v. Regilio*, 669 F.2d 1169, 1172 (7th Cir. 1981); *United States v. Brim*, 630 F.2d 1307, 1311–13 (8th Cir. 1980). *See also Furlow v. United States*, 644 F.2d 764, 768 (9th Cir. 1981). Thus, the seventy-day period may be counted from September 1.

On October 3, the magistrate partially granted one of the defendant's discovery motions. Information disclosed as a result of this decision led the defendant, on October 7, to file another motion to dismiss. The October 7 motion stopped the Speedy Trial clock at the point when thirty-seven days had elapsed. On November 10, the court denied the motion to dismiss. Thirty of the intervening days are reasonably attributed to the prompt determination of that motion and are excluded. 18 U.S.C. § 3161(h)(1)(F) & (J). Thus, by November 10, for purposes of the Speedy Trial Act, forty-one days had elapsed. Under these circumstances, commencement of the trial on November 24 did not violate the Speedy Trial Act.

The defendant urges that the magistrate's June 23 pretrial order requires a different result. That order provided that trial commence on August 29. The order also provided that the magistrate would not extend the time set by the order, absent a

finding that the ends of justice served by an extension outweighed the best interest of the public and the defendant in a speedy trial. On July 29, the trial date was cancelled, but the finding described above was not expressly made. This cancellation is entirely understandable, coming as it did, shortly after the defendant filed a late motion and a separate late affidavit in support of his earlier motions. On August 29, the original trial date, the defendant's numerous motions still burdened the magistrate.

The language in the magistrate's order concerning the finding as a prerequisite to an extension was doubtless borrowed from 18 U.S.C. § 3161(h)(8)(A). The inclusion of this language in the order did not bind the court to a standard more rigid than the statute.

### D. Joinder

#### 1. Rule 8

The defendant asserts that Rule 8, Fed.R.Crim.P. does not authorize joinder of Counts IV and V (perjury and causing a witness to be threatened) with Counts I, II, and III (causing interstate travel and use of interstate facilities to promote a prostitution enterprise). Rule 8(a) authorizes joinder where "offenses ... are based on ... two or more acts or transactions connected together or constituting parts of a common scheme or plan."

There is obviously a degree of connection between the acts charged in the five counts. The expected proof would show Travel Act offenses followed by perjury and threatening of a witness for the purpose of escaping prosecution. In determining whether the connection is sufficient for the purpose of Rule 8(a) "the court should be guided by the extent of evidentiary overlap." *United States v. Zouras*, 497 F.2d 1115, 1122 (7th Cir. 1974). Proof of the Travel Act counts tended to show motive for the charged perjury and threat, and proof of the perjury and threat tended to show defendant's

---

**6.** Our calculations disclose that the trial commenced fifteen days before the Speedy Trial Act deadline. Thus even if the time between July 25 and August 1 must be considered as part of the period under advisement, there is no Speedy Trial Act violation.

awareness of guilt of the Travel Act counts. Specifically, significant testimony in establishing defendant's involvement in the prostitution enterprise came from the witness who was threatened, and the perjury tended to persuade the grand jury that defendant's relationship with Ms. Gasbarri was casual and thus to divert it from discovering the close relationship between them incidental to the operation of the enterprise.

We think the criterion quoted from Rule 8(a) was fulfilled.

### 2. Rule 14

■ The defendant argues that even if Rule 8, Fed.R.Crim.P., permits joinder, the district court should, under Rule 14, Fed.R. Crim.P., have granted his request for relief from prejudicial joinder and ordered trial of Counts I, II, and III separately from Counts IV and V. We may reverse a denial of Rule 14 relief only if the trial court has abused its discretion or committed plain error affecting substantive rights. *United States v. Kopel*, 552 F.2d 1265, 1272 (7th Cir.), *cert. denied*, 434 U.S. 970, 98 S.Ct. 520, 54 L.Ed.2d 459 (1977). Such a reversal would entail finding "that the facts and law presented to the trial judge at the time of the motion for severance demonstrated that a trial under joinder was likely to be unfair and that the trial was in fact unfair." *United States v. Kahn*, 381 F.2d 824, 841 (7th Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 592, 19 L.Ed.2d 661 (1967). *See also United States v. Pacente*, 503 F.2d 543, 546 (7th Cir.), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974).

■ The defendant alleges that credibility was the main issue in this trial and that the jury failed to fully credit his denials of promoting an illegal prostitution enterprise because he was charged with perjury and obstruction of justice and because the prosecution's opening argument posited that the defendant's involvement in the illegal enterprise furnished the motive for his perjury and obstruction of justice. We are not persuaded that the joinder of charges which, *if proved*, might damage his credibility, deprived him of a fair trial, nor that the district court abused its discretion.

### E. Psychiatric Examination

■ The defendant claims that the court committed reversible error by its denial of his request to compel a psychiatric examination of Gasbarri. 91 F.R.D. 159. The district court has broad discretion in determining whether to compel a witness to undergo a psychiatric examination. *United States v. Jackson*, 576 F.2d 46, 48 (5th Cir. 1978); *United States v. Russo*, 442 F.2d 498, 503 (2d Cir. 1971), *cert. denied*, 404 U.S. 1023, 92 S.Ct. 669, 30 L.Ed.2d 673 (1972). *See United States v. LaBarbera*, 463 F.2d 988, 990 (7th Cir. 1972); *United States v. Riley*, 657 F.2d 1377, 1387 (8th Cir. 1981). In exercising this discretion the court must consider the infringement on a witness's privacy, the opportunity for harassment, and the possibility that an examination will hamper law enforcement by deterring witnesses from coming forward. *United States v. Jackson*, 576 F.2d at 49; *United States v. Butler*, 481 F.2d 531, 534 (D.C.Cir. 1973).

■ We have examined defendant's motion and very general supporting affidavit filed at the time of arraignment and cited in his brief. We have also examined the magistrate's report on the motion. We note that on the crucial issues Gasbarri's testimony was corroborated by other witnesses or by documents. We are not persuaded that there was any abuse of discretion.

## II

### TRIAL RULINGS

### A. Medical Records

#### 1. Privilege

■ The defendant takes issue with the trial court's rejection of his counsel's attempts to introduce into evidence as an exhibit the Hope Community Mental Health Center's (Center) records regarding Cira Gasbarri.

Pursuant to a subpoena, the Center provided the records to the grand jury but

indicated that they were confidential and could not be turned over to any other entity.[7] The Center's assertion of a statutory privilege conflicted with the prosecution's obligation to turn over exculpatory material. Therefore, the prosecution placed before the magistrate the question of the disposition of those records. In a July 24, 1980 letter to the magistrate, the prosecutor asserted good cause to disclose the data recording Gasbarri's treatment, diagnosis, and prognosis and the dates of her enrollment, attendance, and discharge. *See* 42 U.S.C. § 4582(b)(2)(C); 42 C.F.R. §§ 2.1–2.-66. The prosecution suggested an order directing the turnover of such data to the court for review and possible disclosure to the defendant. On July 31, the magistrate ordered the Center to disclose such data to him. The Center reported the information to the magistrate on August 11. On September 4, the magistrate ordered the release of this limited information to defense counsel.

This information disclosed that: (1) Gasbarri had been hospitalized at the Center from December 6, 1979 to December 21, 1979, a period subsequent to the 1978 events about which she testified at trial; (2) at the time of her hospitalization, her diagnosis had been psychotic depression reaction transient situational disturbance; (3) during her hospitalization, her treatment consisted of individual and group therapy and 200 mg. of Mellaril every hour for nine days; (4) her prognosis was good; (5) she received outpatient treatment on December 31, 1979 and in 1980 on January 7, 14, and 29, February 8, March 31, April 14, June 20, and July 14; (6) during her outpatient treatment, she received individual therapy with 25 mg. of Mellaril to be taken twice a day as needed.

The magistrate suggested getting Gasbarri's position on turning over the remainder of the records. After Gasbarri objected, the prosecutor, in a letter to the magistrate, proposed to return the records to the Center and suggested that defense counsel subpoena the records to resolve the question of privilege in advance of trial under Fed.R. Crim.P. 17.1. The prosecutor sent a copy of the letter to the defendant's lawyers. The magistrate scheduled a hearing on the issue, but cancelled it when defense counsel advised him that they did not object to the proposal stated in the prosecutor's letter (A.22). Defense counsel did not subpoena the records before trial.

After Gasbarri testified, defense counsel subpoenaed the records. The judge received them on December 4 and allowed defense counsel access to the records. On December 9, the prosecution submitted a memorandum concerning the records. On the next day, the judge stated that, by oversight, she had not opened the sealed materials and read all of the proceedings before the magistrate in connection with the medical records in question until the previous evening. She indicated that she had erred in permitting access to the records. The judge required the return of all copies of the records and stated that the regulations prohibited dissemination until a showing of justification for the release. After criticizing defense counsel for failing to deal with the privilege problem before trial, she said that she would have to hear testimony from an official of the Center before she could determine whether to release the records. The judge then allowed defense counsel an opportunity to explain why they had failed to raise and resolve the privilege question before trial. (Tr. 12/10/80 p. 445.) When defense counsel offered no satisfactory explanation, the court ruled that their failure precluded them from disputing in mid-trial the Center's assertion that the records were privileged. (Tr. 12/10/80 pp. 462–63, 483; 12/15/80 pp. 693–94.)

7. The records contained a statement that "This information has been disclosed to you from records whose confidentiality is protected by [California] Section 5328 Welfare and Institutions Code; and/or federal law. Federal regulations (42 C.F.R. part 2) prohibit you from making any further disclosure of it without the specific written consent of the person to whom it pertains or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is NOT sufficient for this purpose."

In view of defense counsel's consent to the suggestion to resolve the claim of privilege before trial and their failure to do so, the court did not abuse its discretion when it refused to allow defense counsel to interrupt the trial to challenge whether the records were privileged. *See United States v. Jackson*, 621 F.2d 216, 220 (5th Cir. 1980); *United States v. Scanland*, 495 F.2d 1104, 1106 (5th Cir. 1974).

We do not have the records before us. From the remarks of the attorneys at the trial we have determined that in addition to the information disclosed pursuant to the magistrate's order, the records contained: an admitting diagnosis of chronic paranoid schizophrenic (Tr. 12/10/80 p. 453); reference to a prior hospitalization at Camarillo State Hospital in California (Tr. 12/11/80 p. 620); summaries of Gasbarri's conversations including some statements attributed to her about her desire to expose a Wisconsin attorney (Tr. 12/8/80 p. 5). The prosecution conceded the authenticity of these records but opposed their admission not only on the grounds of privilege but also on the grounds of hearsay and insufficient foundation to determine the qualifications of the persons who had reached the recorded conclusions.

After several unsuccessful efforts to have the court reconsider its ruling, defense counsel called two witnesses from the Center. George Paz, a staff psychiatrist and Gasbarri's treating physician at the Center, asserted a statutory privilege under 21 U.S.C. § 1175. The court ordered him to answer those questions necessary to determine whether the privilege applied to his testimony and that of Constance Williams, the clinical director and psychiatric social worker, who treated Gasbarri and wrote most of the records in question. Paz then testified that Gasbarri had not participated in a drug or alcohol abuse program at the Center. The court noted that the statutory privilege in question applied only to such programs. Williams and Paz then testified about Gasbarri's involuntary commitment to the Camarillo State Hospital in 1979, some months prior to her admission to the Center. Paz reported that Gasbarri's family had become concerned after her discharge from Camarillo that they might not be able to care for her, that they needed to have someone with her all the time, and that she was creating inter-personal conflicts with family members. Gasbarri's family brought her to Olive View County Hospital, which advised hospitalization on a voluntary basis and referred Gasbarri to the Center.

Williams and Paz testified that during Gasbarri's stay at the Center her diagnosis was psychotic depressive reaction, and her treatment included doses of Mellaril. Williams said Gasbarri had made statements that she had lost some of her property and had been exploited by an attorney in Wisconsin with whom she had been friends. According to Paz, Gasbarri had difficulty responding directly to questions during her stay at the Center (Tr. 12/15/80 p. 746) and would frequently respond by starting four to ten years prior to the question. In Paz' opinion, based upon his observations of Gasbarri as an outpatient, her psychotic depressive reaction had resolved shortly after Gasbarri's discharge from the Center, but a situational disturbance continued to produce milder forms of anxiety which Paz called "situation adjustment reactions or transient situational disturbances with adjustment reaction."

The court sustained an objection to the relevance of the admitting diagnosis (Tr. 12/15/80 p. 736), a ruling the defendant does not appeal. Defense counsel never asked Paz or Williams any questions about the medical records. Nor did the defense again offer any part of the records.

The court's ruling that the statutory privilege did not bar the testimony of Paz and Williams undermined the Center's claim of privilege, but, by itself, it did not transform the court's previous decision into an abuse of discretion.

## 2. Effective Representation

Defense counsel's failure to qualify the medical records for admission as an exhibit does not rebut the presumption that

counsel afforded the defendant adequate assistance. *United States v. Fleming*, 594 F.2d 598, 607 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). We measure adequacy by the totality of each case's circumstances. *United States v. Starnes*, 644 F.2d 673, 681 (7th Cir. 1981); *United States v. Phillips*, 640 F.2d 87, 92 (7th Cir.), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981), not by an isolated failure. Furthermore, the defendant has shown no prejudice from his counsel's failure. *See United States v. Weir*, 657 F.2d 1005, 1008 (8th Cir. 1981); *United States v. Coupez*, 603 F.2d 1347, 1350 (9th Cir. 1979).

 The defendant made an extensive attack on Gasbarri's credibility and her ability accurately to perceive, recall, and relate events. This attack included evidence of excessive drinking; public lesbian acts; attempts by her to shoot the defendant and to drive her car into his; her confinement at a mental health center; her destruction of electrical outlets, television sets, and other furniture in the belief that the Mafia was after her and that the FBI was in the television, light bulbs, thermostat, telephone wires, and telephone poles; her statements that she had attended her own funeral three or four times, that she was being followed, that her home was being filled with poison gas, and that the defendant had burned the Showbar and had hired someone to kill her (the alleged hired killer categorically denied Gasbarri's statement); the diagnosis of her attending physician that in late 1979 she was undergoing a psychotic depressive reaction which may have involved delusions; and her physician's testimony that he had prescribed Mellaril for her.

In view of the testimony of George Paz and Constance Williams and the other evidence which attacked Gasbarri's credibility, the records may have added little or nothing to the extensive onslaught.

### B. Gasbarri Subpoena

The prosecution called Cira Gasbarri, at that time a California resident, as its first witness. She testified and defense counsel cross-examined her on November 24 and 25. Defense counsel subpoenaed Gasbarri to reappear on December 12 as a defense witness. The prosecutor moved to quash the subpoena. The court granted the motion. The defendant advances several rationales for finding that the trial court erred when it quashed his subpoena to recall Gasbarri.

### 1. Prosecution Standing

 The defendant urges that the prosecution had no standing or authority to move to quash the subpoena. We disagree. A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests. *In re Grand Jury*, 619 F.2d 1022, 1027 (3rd Cir. 1980). The prosecution's standing rested upon its interest in preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on Gasbarri's credibility.

### 2. Confrontation

 The defendant argues that quashing the subpoena violated the defendant's constitutional right to confront Gasbarri. The Sixth Amendment right to confront witnesses through cross-examination "is not without some reasonable limitation within the sound discretion of the trial judge." *United States v. Hansen*, 583 F.2d 325, 332 (7th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). When, as here, the defendant has already subjected the witness to an intense and complete cross-examination, a trial judge's refusal to recall the witness for further cross-examination does not violate the defendant's right to confront the witnesses against him. *United States ex rel. King v. Schubin*, 522 F.2d 527, 529 (2d Cir.), *cert. denied*, 423 U.S. 990, 96 S.Ct. 403, 46 L.Ed.2d 309 (1975); *United States v. Somers*, 496 F.2d 723, 734 (3rd Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). *See Alford v. United States*, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *Faust v. United States*, 163 U.S. 452, 455, 16 S.Ct. 1112, 41 L.Ed. 224 (1896).

### 3. Right to Call Witnesses

The defendant asserts that quashing the subpoena deprived him of the right to call Gasbarri as a witness in his favor. Unless Gasbarri would have produced relevant and material testimony which favored the defendant, the quashing of the subpoena could not have violated the defendant's right to call witnesses in his favor. *United States v. DeStefano*, 476 F.2d 324, 330 (7th Cir. 1973).

The judge used great effort to find out whether Gasbarri's reappearance would lead to the introduction of substantive evidence. She invited defense counsel to submit a written *ex parte* statement of the substantive evidence they would seek to elicit if she allowed them to recall Gasbarri. They never responded to that invitation. We accept the court's conclusion based on defendant's earlier oral offer of proof that the defense sought to recall Gasbarri solely to impeach her further. The right to produce witnesses does not extend to such a recall.

### 4. Policy Arguments

The defendant argues that he should have been allowed to subpoena Gasbarri because (1) requiring a defendant to explore every possible area of cross-examination during the prosecution's case might result in defeating a motion for a judgment or a directed verdict of acquittal and (2) during cross-examination of the prosecution's initial witnesses, defense counsel may be unaware of things which become known later in the trial. These arguments have some abstract merit, but the defendant fails to show that they apply to his case. Furthermore, Fed.R.Evid. 611 lists the policy considerations which shall guide a trial court's reasonable control over the mode and order of interrogating witnesses: (1) effectiveness for the ascertainment of truth; (2) avoiding needless consumption of time; and (3) protecting witnesses from harassment or undue embarrassment. On the record before us we cannot say that the trial court departed from the standards of Rule 611.

### C. The Defendant's Direct Examination

The following exchanges occurred during the defendant's direct testimony:

BY MR. DAN LINEHAN [Counsel for the defendant]: Q. Do you remember testifying before the Grand Jury in this case?

A. Yes, I do.

Q. Do you remember being asked whether or not you flew to Reno, Nevada, with Cira Gasbarri in September of 1978?

A. Yes, I do.

Q. Do you remember being asked if you flew back to Minneapolis with Cira Gasbarri in October of '78?

A. Yes, I do.

Q. What did you answer to those questions?

A. My answer, on the way to Reno I didn't believe that I flew on the same plane with her. I believe that she flew directly to California.

Q. You said you didn't fly there with her, didn't you?

A. That was my honest belief. I didn't think that she was on the plane with me. I couldn't remember her being there.

Q. And this was—

MR. TUERKHEIMER [United States Attorney]: Your Honor, I move to strike that portion of the answer which was "That was my honest belief."

MR. DAN LINEHAN: I object to that motion.

MR. TUERKHEIMER: I think that's what the jury can decide, not for the witness.

THE COURT: The motion is granted and the jury should disregard the witness's statement about that. That is a decision for the jury to make.

. . . .

BY MR. DAN LINEHAN: Q. Alec, when you testified before the Grand Jury did you believe that you had flown to Reno in 1978 in September with Cira Gasbarri?

A. I believed I went alone.

(Tr. 12/11/80 pp. 16–18)

Raineri's testimony that he believed his statement to the grand jury when he made it was allowed to stand. We reject the defendant's argument that by striking the redundant characterization of his belief as "honest" the court unduly prejudiced the presentation of his defense.

### D. Post-Summation Comment

■ Defense counsel's summation included an extensive argument on the credibility of numerous prosecution witnesses. Yvonne Spears was the subject of an especially emphatic commentary, parts of which follow:

"July and August, Gross and Spears. And Gross again testified, no prostitution. Spears testified that there was prostitution. She told the FBI when they took the stand it was out of context that she was the only girl involved in prostitution. But she had a key to the upstairs. She was doing it on her own. Today she says there was more. There's been no immunity granted to Miss Spears. I venture to say that she was the only witness who came without a subpoena. She testified to that fact. Why? Use your common sense. The letters are in evidence. Read them. Read them when you get to the jury room. Immunity or a letter of intent of immunity from Iron County from the District Attorney. Correspondence between Mr. Tuerkheimer [the United States Attorney] and the people in Milwaukee where she was in on five counts of sale of heroin.

"She talked to Mr. Burg [an FBI Special Agent]. $25,000 cash bond. Couldn't make that. Apparently she wasn't making that much money either selling heroin or as a prostitute in Milwaukee. But she knows how to get what she wants. She's for sale and that lady knows it. She talks to Mr. Burg. Her bond is dropped to signature bond. Four counts are dropped and she pled to one count of sale of heroin. She's on the streets.

"Hasn't been sentenced yet; keep that open until after she testifies here. I think her testimony is sickening. I think it's incredible, totally incredible. If I had the power of the Government to move people['s] lives in that manner and to work in conjunction with other law enforcement, even to give a recommendation that could help, I think I could probably bring 20 or 30 heroin dealers and prostitutes from Milwaukee before you and say that they had face [8] with Mr. Tuerkheimer or that Milwaukee doesn't even exist.

" . . . .

"Spears comes back in, tries to take over some control because she had seen that prostitution was run wide open. And Spears is going to take advantage of anybody she can. And don't let anybody tell you any different. Interesting stipulation with Spears. You find it; it's in the evidence. The banker who notarized the fact that she wasn't in prostitution, who wasn't her best trick. There is a stipulation signed between me and Mr. Tuerkheimer representing the United States Government that if that banker were to testify that he would testify that he was never at the Showbar, that he was never a date of Yvonne Spears and anything to the contrary is untruthful in his opinion. "Do you think for one minute the Government is going to give me that in this case if it weren't true? They know it. They're covering for their witnesses now. They come on strong and now they're covering."

(Tr. 12/16/80 pp. 950–955)

After defense counsel concluded the judge said:

"Thank you, Mr. Linehan [defense counsel]. I believe it is necessary to advise the jury, however, that they should disregard any implication by Mr. Linehan in his closing argument implying that the

---

**8.** The prosecution suggests that the word "face" is an error in the transcript and that defense counsel actually used the word "sex."

Government arranged or procured untruthful testimony by Yvonne Spears. Whether or not Yvonne Spears is credible or not is entirely up to you to determine and nothing that I say is intended to affect your determination of that. But it is not proper for a lawyer to imply that another side has procured untruthful testimony."

Thereafter defense counsel moved for a mistrial on the grounds that the judge's remark was not a fair comment on his argument. Alternatively, defense counsel requested the court to retract its comment or to instruct the jury to disregard it. The court denied all these requests.

The court's comment did not encourage the jury to disregard defense counsel's argument that Spears testified falsely. The full context demonstrates that the court told the jury to disregard only the possible implication that the prosecution knowingly procured untruthful testimony. The words used by defense counsel could be interpreted as a suggestion that the prosecution purchased untruthful testimony. The judge personally observed the argument. In the circumstances, we find no reversible error in the comment.

## III

## SUFFICIENCY OF THE EVIDENCE

### A. Travel Act Violations

The defendant contests the sufficiency of the evidence which supports his convictions for the violations of the Travel Act, 18 U.S.C. § 1952, charged in the first three counts of the indictment. The Travel Act provides:

"(a) Whoever travels in interstate ... commerce or uses any facility in interstate ... commerce, including the mail, with intent to ...

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

"and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving ... prostitution offenses in violation of the laws of the State in which they are committed...."

To convict the defendant for violating this statute in the manner charged in the indictment the prosecution had to prove that the defendant (1) with intent to promote a business enterprise involving illegal prostitution, (2) caused[9] someone to travel in interstate commerce or use an interstate facility, and (3) the defendant thereafter promoted or attempted to promote the business enterprise. *United States v. Stevens*, 612 F.2d 1226, 1231 (10th Cir. 1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *United States v. McPartlin*, 595 F.2d 1321, 1361 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Craig*, 573 F.2d 455, 489 (7th Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978). *See United States v. Hedge*, 462 F.2d 220, 223 (5th Cir. 1972).

The defendant virtually concedes the sufficiency of the evidence which demonstrated his intent to promote prostitution at the Showbar and his promotion of prostitution there. To whatever extent he challenges the sufficiency of that evidence his challenge is meritless. The defendant raises three points which warrant discussion: that the use of the facilities in interstate commerce (1) was unconnected to him; (2) was unconnected to the prostitution enterprise;

---

**9.** Although 18 U.S.C. § 1952 only expressly applies to one who travels in or uses any facility in interstate or foreign commerce, 18 U.S.C. § 2(b) allows indictment and conviction for causing such travel or use. *United States v. Peskin*, 527 F.2d 71, 76 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). Under the Travel Act, each act of inter-

state travel and each interstate use may constitute a separate offense. *United States v. Alsobrook*, 620 F.2d 139, 142 (6th Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980); *United States v. Polizzi*, 500 F.2d 856, 898 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

and (3) constituted, at most, a happenstance. The defendant's first two arguments seem to question whether, when viewed in the light most favorable to the prosecution, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence would enable a reasonable juror to conclude beyond a reasonable doubt that the defendant's intentional promotion of a prostitution enterprise caused the three proven uses of facilities in interstate commerce. The defendant's third argument questions whether Congress extended federal criminal jurisdiction to the defendant's activities.

### 1. Showbar Prostitution

During the period when the defendant promoted prostitution at the Showbar, dancers employed by the bar would go to booths in the bar and masturbate those customers who spent thirty-five or fifty dollars for a three dollar bottle of champagne.[10] During the same period, the dancer/prostitutes would make arrangements·in the bar for the sale of their sexual favors to customers of the bar. Prostitutes would either put a share of their receipts into a box in the ladies' dressing room or give it to the bartender. Above the bar there were about twenty rooms with beds used for prostitution. The rooms were supplied with sheets, pillowcases, and electricity. This evidence demonstrated that illegal prostitution permeated the Showbar.

### 2. The Defendant's Involvement

In 1976, at the defendant's request Cira Gasbarri returned from California to reopen the Showbar, which her husband had operated as a prostitution enterprise before his death in November, 1975. From late 1976 until early 1979, the defendant managed the Showbar in conjunction with Gasbarri. He gave her fifty dollars for every night she worked at the Showbar. At his urging Gasbarri permitted prostitution in the Showbar. After she had once removed prostitution related booths from the bar, the defendant told her to put them back and let the girls mingle with the ·customers or the Showbar would not survive. Throughout this period, the defendant and Gasbarri collected, and the defendant usually retained, the proceeds from this prostitution. He prepared Showbar checks for Gasbarri's signature, recorded information on check stubs and deposit slips, helped her with payroll problems, participated in hiring and firing employees, recruited a bartender, chose Jim Vitich to run the enterprise during his trip to Reno with Gasbarri, worked with her whenever problems arose, dealt with the bar's accountant regularly, and counted the bar and prostitution proceeds. At his request, various dummy officers signed liquor license forms. In June, 1978, when Patricia Colossaco told him about the prostitution, the defendant replied that she had nothing to worry about. When Wisconsin Alcohol and Tobacco Enforcement Division agents made a routine inspection of the Showbar, in March, 1979, he spoke to them over the phone, represented himself as the janitor, yelled at them, harassed them, and told them they would not get very far with any prosecution in the county. The defendant had served as Circuit Judge for Iron County,[11] Wisconsin, since January 1, 1978. The defendant's statements to the state agents permitted the jury to infer that he would have used his official position to protect his prostitution enterprise.

This evidence sufficed to allow a reasonable juror to find that the defendant caused prostitution to permeate the Showbar and rendered the Showbar an instrumentality of a prostitution enterprise. Therefore the jury could reasonably conclude that the defendant caused[12] whatever use the Show-

---

**10.** Effective June 1, 1978, Wisconsin defined the offense of prostitution to include intentionally masturbating a person for any thing of value. Wis.Stat. § 944.30(4); *City of Madison v. Schultz*, 98 Wis.2d 188, 197, 295 N.W.2d 798 (Ct.App.1980). Although some of the testimony on this point concerned a period before the change in the statute, there was similar testimony covering a period thereafter.

**11.** Iron County includes Hurley.

**12.** Convictions under 18 U.S.C. § 1952 do not require that the defendant knowingly cause or reasonably foresee interstate travel or use of an interstate facility. *United States v. McPartlin*, 595 F.2d 1321, 1361 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Craig*, 573 F.2d 455, 489, (7th

bar made of facilities in interstate commerce to further prostitution. *United States v. Inciso*, 292 F.2d 374, 378 (7th Cir.), cert. denied, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961); *United States v. Levine*, 457 F.2d 1186, 1188 (10th Cir. 1972).

### 3. The Interstate Elements

■ The benefit sought or gained from the interstate travel or use need not be essential to the illegal activity. *United States v. McLeod*, 493 F.2d 1186, 1189 (7th Cir. 1974); *United States v. Miller*, 379 F.2d 483, 486 (7th Cir.), cert. denied, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967). It need only hold the promise of facilitating that activity. *United States v. Craig*, 573 F.2d at 467, 489 (unsuccessful effort to obtain help in collecting money to pay bribes); *United States v. Hedge*, 462 F.2d 220 (5th Cir. 1972) (shipment never picked up).

■ With respect to Count I, the prosecution proved the use of a facility in interstate commerce by showing that a payroll check drawn August 12, 1978 on the Showbar's Michigan bank account [13] was given, in Hurley, Wisconsin, to Yvonne Spears, a dancer and prostitute at the Showbar, as compensation for her nude dancing, and crossed the state line in the process of collection. Gasbarri signed the check. A reasonable juror could have found that the payment to a prostitute for nude dancing facilitated prostitution at the Showbar.

Count II was based upon a September 12, 1978, check drawn on the Showbar's Michigan bank account and used in Wisconsin to pay the Lake Superior Power Company, a Wisconsin business, for power at the Showbar. The defendant prepared this check for Gasbarri's signature. The check crossed state lines as part of the regular clearance process. Among other things, electricity was used to light the barroom and the upstairs rooms, to chill the champagne, and to provide musical accompaniment for the dancer/prostitutes. Thus a reasonable juror could have found that the payment facilitated prostitution.

The delivery of sheets and pillowcases from Hibbing, Minnesota, to the Showbar on October 2, 1978, formed the basis for Count III. Two prostitutes testified that they found sheets and pillowcases on the beds where they worked upstairs. Thus the jury also could have concluded that the interstate delivery of the linen facilitated prostitution.

■ In a Travel Act prosecution the interstate travel or use must relate significantly, rather than incidentally or minimally, to the illegal activity. *United States v. Craig*, 573 F.2d at 489. Proof that the defendant, without detriment to the illegal enterprise, could have replaced the interstate travel or use with an intrastate activity does not suffice by itself to prove the insignificance of the interstate element. We test the sufficiency of the jurisdictional basis (the interstate element), not by blackletter rules but by "the nature and degree of interstate activity in furtherance of the state crime." *United States v. Rauhoff*, 525 F.2d 1170, 1174 (7th Cir. 1975) quoting *United States v. Isaacs*, 493 F.2d 1124, 1148 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

The jury could readily find that the maintenance and regular use of a bank account and the use of a linen supply house were significant in facilitating the illegal enter-

Cir. 1977), cert. denied, 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978); *United States v. Peskin*, 527 F.2d at 78.

Because the Travel Act counts did not require proof that the defendant knew of the use of an interstate facility, the trial court correctly rejected his request to instruct the jury that knowledge of such use was required.

The Sixth Circuit rejects the majority position and holds that a defendant must have actual knowledge of the interstate activity. *United States v. Alsobrook*, 620 F.2d 139. We continue to adhere to the majority position because we believe that an implied scienter requirement would severely undermine the Travel Act's purpose: to assist local authorities in combating criminal activities that extend beyond the borders of one state. *United States v. Peskin*, 527 F.2d at 78. We note that the reach of the Travel Act extends beyond organized criminal activity occurring in one state but managed from another. *Erlenbaugh v. United States*, 409 U.S. 239, 247 n.21, 93 S.Ct. 477, 482 n.21, 34 L.Ed.2d 446 (1972); *United States v. Archer*, 486 F.2d 670, 678–80 (2d Cir. 1973).

**13.** The Showbar maintained the account in question under the name Ritz Bar, Inc.

prise. Whatever the reason for the choice of bank or linen supply house, transactions with the ones chosen involved travel or use of a facility in interstate commerce. It was unnecessary to identify some particular advantage derived out of the location of the bank account in Michigan or the linen supply house in Minnesota.

The case before us is not one where violation of the Travel Act was predicated upon fortuitous or isolated and insignificant interstate involvement, merely because a victim cashed a check before paying an extortioner, *compare, United States v. Altobella*, 442 F.2d 310, 315 (7th Cir. 1971), or because of the fortuitous organization of the Federal Reserve System, *compare, United States v. Isaacs*, 493 F.2d 1148, or because of the geographical origin of customers, *compare, Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). In the case before us "the nature and degree of interstate activity in furtherance of the state crime" provides a sufficient basis for the exercise of federal jurisdiction. *United States v. Rauhoff*, 525 F.2d at 1174.

### B. False Declarations

 The defendant contends that his false statements before the grand jury were not material to its investigation. The materiality of a false statement is an essential element of the crime and is a question of law for the court to decide. *United States v. Picketts*, 655 F.2d 837, 840 (7th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981). *See Sinclair v. United States*, 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929). We have defined materiality as a statement's "effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." *Picketts*, 655 F.2d at 839; *United States v. Parker*, 244 F.2d 943, 950–951 (7th Cir.), *cert. denied*, 355 U.S. 836, 78 S.Ct. 61, 2 L.Ed.2d 48 (1957). *See United States v. Whimpy*, 531 F.2d 768, 770 (5th Cir. 1976) (anything that could influence or mislead); *United States v. Percell*, 526 F.2d 189, 190 (9th Cir. 1975) (relevant to any subsidiary issue under consideration); *United States v. Koonce*, 485 F.2d 374, 380 (8th Cir. 1973) (tending to influence, mislead, or hamper).

Potential interference with a line of inquiry suffices to establish materiality, regardless of whether the perjured testimony actually serves to impede the investigation. *United States v. Howard*, 560 F.2d 281, 284 (7th Cir. 1977).

 In March, 1980, before the grand jury, the defendant stated: that he and his wife were like brother and sister to Gasbarri and her husband; that after the death of Gasbarri's husband, the defendant's relationship with Gasbarri remained the same, that the defendant and Gasbarri did not have an affair and did not travel together alone except for one time when he took her to the hospital in Duluth, and once or twice when he took her to Milwaukee to shop when he was driving there to sit in criminal court. When asked before the grand jury about a trip he took in September and October, 1978, to a judicial seminar in Reno, Nevada, the defendant said that he did not travel to and from Reno with Gasbarri; that she came there with her brother and sister; that either they looked him up or he ran into her sister by accident; and that he probably spent one day with Gasbarri in Reno. In fact, the defendant traveled to and from Reno with Gasbarri and they stayed together for the three weeks except for three or four days. He paid for her travel expenses.

The relationship between the defendant, a Circuit Judge and former District Attorney, and Gasbarri, the person ostensibly in charge of the Showbar, was important to the grand jury's investigation into the defendant's involvement in the prostitution enterprise. The defendant's false statements had the tendency to impede the grand jury from discovering the nature and the depth of that relationship. Therefore they were material.

### C. Obstructing Justice

 The defendant asserts that the record contains insufficient evidence to show that he knew that Patricia Colossaco, the person he arranged to have threatened, would be a witness before the grand jury. The defendant knew about the pending grand jury investigation. He had testified before the grand jury, at which time the United States Attorney had told him that

he was a target of the investigation, and had asked him whether Colossaco had ever told him there was prostitution at the Showbar. The defendant answered the question negatively. From these facts the jury could reasonably infer that, on the very next day, when the defendant endeavored to silence Colossaco, he knew that Colossaco was going to be a witness before the grand jury. *Odom v. United States*, 116 F.2d 996, 999 (5th Cir.), *rev'd on other grounds*, 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511 (1941).

In light of our conclusions that the trial judge did not err in her various rulings and that the evidence supports the convictions, the judgment is AFFIRMED.

## ORDER

On consideration of the petition for rehearing with suggestion for rehearing *in banc*, filed by counsel for the defendant-appellant in the above entitled cause, all members of the original panel having voted to DENY a rehearing, and no member in regular active service having requested a vote on the *in banc* suggestion, accordingly,

IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.

The mandate of this Court issued March 9, 1982. On March 10, 1982 we entered an order permitting defendant to file his petition for rehearing instanter. Under the circumstances it would have been appropriate to recall the mandate pending consideration of the petition for rehearing, and the mandate would have been stayed pursuant to Rule 41(a), F.R.A.P.

The petition for rehearing now having been considered and DENIED,

IT IS ORDERED that the mandate be deemed to have been recalled. It will again issue seven (7) days after the date of the order, unless further stayed. Under the circumstances, the record now in the district court need not be physically returned to this Court.

On March 22, 1982 defendant filed a motion for continued stay of execution of sentence. The purpose of the motion will be accomplished by the recall of mandate herein ordered, and the motion is therefore, DENIED.